*Kyle Blackstone, et al. v. Dinesh Sharma, et al.; Terrance Shanahan, et al. v. Seyed Marvastian, et al.*, No. 40, September Term, 2017; *Laura O'Sullivan, et al. v. Jeffrey Altenburg, et al.,* No. 45, September Term 2017; *Martin Goldberg, et al. v. Martha Neviaser, et al.*, No. 47, September Term 2017. Opinion by Getty, J.

**COLLECTION AGENCIES — MARYLAND COLLECTION AGENCY LICENSING ACT — SCOPE OF LICENSING REQUIREMENT**

The Court of Appeals of Maryland concluded that the plain language of the Maryland Collection Agency Licensing Act ("MCALA" or "the Act") is ambiguous as to whether the Maryland General Assembly intended foreign statutory trusts, acting as a special purpose vehicle in the mortgage industry, to obtain a license as a collection agency. Md. Code (1992, 2015 Rep. Vol.), Bus. Reg. ("BR") § 7-301, *et seq.* The Court, therefore, analyzed the legislative history, subsequent legislation, and related statutes in order to determine the legislative intent in enacting the original version of MCALA in 1977 as well as the reason the Department of Labor, Licensing, and Regulation ("DLLR" or "Department") requested a departmental bill to revise MCALA in 2007. The Court ultimately held that the General Assembly did not intend for foreign statutory trusts to obtain a collection agency license under MCALA before its substitute trustees filed foreclosure actions in various circuit courts. As such, the Court held that the circuit courts improperly dismissed the foreclosure actions solely on the basis that the two foreign statutory trusts, which owned the mortgage loans in each of the cases *sub judice*, were not licensed as a collection agency under MCALA before the substitute trustees instituted the foreclosure proceedings.

Circuit Court for Montgomery County
Case No. 397954V

Circuit Court for Montgomery County
Case No. 396663V

Circuit Court for Howard County
Case No. 13-C-16-106882

Circuit Court for Washington County
Case No. 21-C-15-055314

Argued: November 30, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 40, 45, & 47

September Term, 2017

KYLE BLACKSTONE, ET AL.

v.

DINESH SHARMA, ET AL.

TERRANCE SHANAHAN, ET AL.

v.

SEYED MARVASTIAN, ET AL.

LAURA O'SULLIVAN, ET AL.
SUBSTITUTE TRUSTEES

v.

JEFFREY ALTENBURG, ET AL.

MARTIN S. GOLDBERG, ET AL.
SUBSTITUTE TRUSTEES

v.

MARTHA LYNN NEVIASER, ET AL.

Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,
Harrell, Glenn T., Jr.,
    (Senior Judge, Specially Assigned)

JJ.

Opinion by Getty, J.
Adkins and McDonald, JJ. dissent.

Filed: August 2, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This case is a consolidated appeal of four circuit court cases in which the parties contest the application of a 2007 departmental bill revising the Maryland Collection Agency Licensing Act ("MCALA" or "the Act"). Md. Code (1992, 2015 Rep. Vol.), Bus. Reg. ("BR") § 7-301, *et seq.* The overarching issue presented in these consolidated cases is whether MCALA, as revised by the 2007 departmental bill, is constrained to the original scope of collection agencies seeking consumer claims or whether the revised statutory language propels MCALA requirements across the threshold of the mortgage debt arena, requiring principal actors of Maryland's mortgage market to obtain a collection agency license.

MCALA was first enacted in 1977 to protect Maryland consumers from abusive debt collection practices employed by the collection agency industry. 1977 Md. Laws, ch. 319. The Act specifically defined "collection agencies" as entities engaged in the practice of collecting consumer debts for others, excluding those entities collecting debts they owned. Pursuant to MCALA, these third-party debt collectors were required to obtain a license as well as file a surety bond of $5,000 for the benefit of the State and any member of the public damaged by such collection agencies. BR § 7-301; 7-304. The State Collection Agency Licensing Board ("the Board"),[1] located within the Department of

---

[1] The Board also enforces the Maryland Consumer Debt Collection Act ("MCDCA"). Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 14-201, *et seq.* The MCDCA generally prohibits "a collector" from threatening consumers, disclosing consumer information, contacting the consumer's employer, harassing the consumer, using obscene language with consumers, claiming a nonexistent right, or simulating the legal, judicial, or governmental process when collecting or attempting to collect an alleged debt. CL § 14-202. Although the MCDCA is separate from MCALA, a collection agency that seeks a license under

Labor, Licensing, and Regulation ("DLLR" or "Department"), is responsible for enforcing the Act.  BR § 7-201.

In 2007, DLLR requested a departmental bill (House Bill 1324) to revise the definition of collection agencies required to obtain the MCALA license.  Specifically, the Department submitted a bill request, explaining that the legislation would allow DLLR to regulate actors in the collection industry that employ a loophole in MCALA's licensing requirement by purchasing delinquent consumer debt for goods and services by way of a purchase contract that mirrors a collection agency agreement.  When enacted, the departmental bill specifically changed MCALA's definition of "collection agencies" to include a person who engages directly or indirectly in the business of "collecting a consumer claim the person owns, if the claim was in default when the person acquired it[.]" 2007 Md. Laws, ch. 472.

Each of the circuit courts below, along with the Court of Special Appeals, found that foreign statutory trusts acting as a repository for defaulted mortgage debts were required to obtain a license as a collection agency pursuant to MCALA before its substitute trustees filed a foreclosure action in the circuit court.  The substitute trustees each petitioned this Court for certiorari, asserting that the circuit courts improperly dismissed the foreclosure actions because the foreign statutory trusts do not fall under the definition of "collection agencies" that are licensed and regulated by MCALA.  This Court is

---

MCALA must agree to comply with the MCDCA in order to obtain a license.  BR § 7-304(c)(3).

therefore called upon to determine the scope of MCALA.[2]  Specifically, the limited legal issue in these consolidated cases is whether the General Assembly intended a foreign statutory trust, as owner of a delinquent mortgage loan, to obtain a license as a collection agency under MCALA before substitute trustees instituted a foreclosure action against a homeowner who defaulted on his or her mortgage.  As explained below, the legislative history, subsequent legislation, and related statutes make clear that the 2007 departmental bill did not expand the scope of MCALA to include mortgage industry players seeking foreclosure actions; thus, this Court answers that question in the negative.[3]

---

[2] On June 28, 2018, the Supreme Court granted certiorari in *Obduskey v. McCarthy & Holthus LLP*, which presents a somewhat parallel federal issue.  -- S. Ct. -- (2018) (No. 17-1307), 2018 WL 1335753, at *1.  Specifically, the Supreme Court granted certiorari in order to resolve whether the Fair Debt Collection Practices Act ("FDCPA") applies to non-judicial foreclosure proceedings.  *See* 15 U.S.C. §§ 1692(e).  The Supreme Court's decision to grant certiorari in this case emphasizes that the language of the FDCPA has generated conflicting opinions as to its scope amongst federal and state courts alike.  This also underscores that courts have struggled to decide whether the FDCPA, if found to apply to foreclosure proceedings, would conflict with state foreclosure law.  *See Brief for Petitioner* at *2, *Obduskey v. McCarthy & Holthus LLP*, -- S. Ct. -- (2018) (No. 17-1307), 2018 WL 1359494 ("This case presents an important and recurring question of statutory construction that has squarely divided the lower courts.  According to the Tenth Circuit, the FDCPA does not apply to non-judicial foreclosure proceedings.  In so holding, the court sided with a split panel of the Ninth Circuit, and openly rejected the contrary decisions of multiple courts of appeals and two state supreme courts. . . .  It reasoned that applying the FDCPA in this context 'would conflict with Colorado mortgage foreclosure law.'").

[3] This Court holds that the 2007 departmental bill does not expand the scope of MCALA to the mortgage industry.  Therefore, the Court need not reach the following three issues: (1) whether instituting a foreclosure action constitutes "debt collection" under MCALA when a person or entity apart from foreign statutory trusts owns the loan; (2) whether the other actors, such as the trustees, substitute trustees, and the mortgage loan servicer, held the appropriate licenses; and (3) whether the foreign statutory trusts, its trustees, substitute trustees, or mortgage loan servicers engaged in practices in violation of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law §§ 14-201, *et seq.*, the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.*, or the

## BACKGROUND

This appeal constitutes two cases consolidated before the Court of Special Appeals as well as two additional actions appealed to this Court directly from circuit court foreclosure proceedings. In each of the cases *sub judice*, the respondents obtained a mortgage loan from a creditor to purchase, convey, or refinance their homes. The loans were evidenced by a promissory note and secured by a deed of trust. Eventually, the homeowners all missed loan payments, resulting in the banks declaring the loans to be in default. At some point after the respondents defaulted on the mortgage loans, the banks transferred the loans and all beneficial interest in the deed of trust as part of a securitized pool of mortgage loans to either Ventures Trust 2013-I-H-R ("Ventures Trust") or LSF9 Master Participation Trust ("LSF9"), both of which are foreign statutory trusts organized under Delaware law.

These foreign statutory trusts acted through trustees which in these cases were other banks. A separate loan servicer was assigned to communicate with the borrowers and collect the monthly mortgage payments. The trustees subsequently appointed substitute trustees, conveying all rights and duties under the deeds of trust, including the power of sale. The substitute trustees subsequently initiated foreclosure actions to enforce the

FDCPA, 15 U.S.C. §§ 1692, *et seq.* Our holding today in no way undermines the consumer protections found in any of these statutes, including MCALA. Instead, this Court clarifies that foreign statutory trusts, acting as special purpose vehicles in the mortgage industry, were outside of the purview of the collection agency industry that the General Assembly intended to license when it enacted MCALA and passed the 2007 departmental bill.

security interest against the defaulting borrowers, meaning that the substitute trustees are the petitioners in each of the cases *sub judice*.

In response, the defaulting homeowners filed counter complaints arguing that the foreign statutory trusts acted as collection agencies as defined under MCALA when they obtained defaulted mortgage loans and then collected mortgage payments through communication and foreclosure actions without being licensed as required by MCALA. *See* BR § 7-301, *et seq.* The counter complaints further alleged that, by attempting to collect mortgage payments without the required license under MCALA, the foreign statutory trusts violated the Maryland Consumer Debt Collection Act ("MCDCA"). Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 14-201, *et seq.*

In addition to filing counter complaints, the borrowers in default requested that the circuit courts dismiss or enjoin the foreclosure sales. To support the request, the borrowers argued that the foreign statutory trusts brought the foreclosure action without being licensed as a collection agency, violating MCALA and MCDCA, and that any judgment obtained by an unlicensed entity acting as a collection agency would be void. *See Finch v. LVNV Funding, LLC*, 212 Md. App. 748, 759 (2013). In response, the substitute trustees argued that the foreign statutory trusts were neither doing business in the State nor doing business as a collection agency when they filed foreclosure actions, that MCALA did not apply to the *in rem* proceedings, that the foreign statutory trusts constituted trust companies exempted from the Act, and that the homeowners failed to specify a relevant defense under Maryland mortgage foreclosure law. *See* Md. Code Ann., Real Prop. ("RP") § 7-101, *et seq.*; Md. Rules 14-201, *et seq.*; Md. Code Regs. 09.03.12.01, *et seq.*

5

The circuit courts all held motions hearings to consider the various arguments regarding MCALA. In each of the cases *sub judice*, the circuit courts issued an order dismissing the foreclosure proceeding without prejudice after finding that the foreign statutory trusts were in the business of collecting consumer debt because the entities indirectly attempted to collect on a defaulted mortgage loan purchased at a discount. The courts also determined that the foreign statutory trusts did not fall under the trust company exemption to MCALA. After determining that the foreign statutory trusts were subject to the MCALA licensing requirements, the circuit courts noted that there was no dispute that Ventures Trust and LSF9 lacked the required collection agency license. As such, the circuit courts concluded that foreign statutory trusts had no right to bring the foreclosure actions, dismissing each of the cases without prejudice.

We will summarize the factual background of each of the individual cases in turn below.

A. **Kyle Blackstone,** *et al.* **v. Dinesh Sharma,** *et al.***; Terrance Shanahan,** *et al.* **v. Seyed Marvastian,** *et al.*

    i.      **Kyle Blackstone,** *et al.* **v. Dinesh Sharma,** *et al.*

In 2006, Ruchi Sharma owned a home located at 10302 Oaklyn Drive, Potomac, Maryland, which she wished to sell to her parents, Mr. Dinesh Sharma and Mrs. Santosh Sharma. In order to finance the home purchase, Dinesh and Santosh Sharma sought to obtain a loan in the amount of $1,920,000.00 from Washington Mutual Bank, FA ("WMB"). The loan was evidenced by a promissory note and secured by a deed of trust. WMB asked Ms. Ruchi Sharma, who accompanied Dinesh and Santosh to the bank, to sign

6

the deed of trust because the conveyance was not an arm's length transaction. Therefore, Rushi Sharma, Dinesh Sharma, and Santosh Sharma ("the Sharmas") all signed the closing documents, including the deed of trust.[4]

On December 2, 2007, WMB declared the Sharmas to be in default on the promissory note. A little less than six years later, Ventures Trust acquired the Sharmas' loan and all beneficial interest in the deed of trust as part of a securitized pool of mortgage loans. Ventures Trust acted through its trustee, MCM Capital Partners, LLC ("MCM"). In 2014, Ventures Trust, through MCM, appointed substitute trustees, Kyle Blackstone, William O'Neil, and Terrance Shanahan. On November 25, 2014, the substitute trustees initiated a foreclosure action in the Circuit Court for Montgomery County to enforce the security interest in the Sharmas' real property.

In response, the Sharmas filed a counter complaint against the substitute trustees as well as MCM, as trustee for Ventures Trust. The counter complaint alleged that Ventures Trust acted as a collection agency as defined under MCALA when it purchased the defaulted mortgage loan without being licensed. *See* BR § 7-301, *et seq.* The counter complaint[5] further alleged that by attempting to collect mortgage payments from the

---

[4] The record indicates that there may have been some inconsistencies in executing the loan. For example, the record states that the Sharmas were required to return to the bank in order to sign additional loan documents on August 7, 2006; there is also some evidence that the Sharmas were misinformed about the amount of the principal loan as well as monthly payments. However, these facts are not relevant to the central issue in this case.

[5] Although not relevant to the instant analysis, the counter complaint also alleged that Ventures Trust violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* The counter complaint also included two counts for declaratory judgment and injunctive

7

Sharmas without the required license under MCALA, Ventures Trust violated the MCDCA. CL § 14-201, *et seq.*

In addition to the counter complaint, the Sharmas filed a motion to dismiss or enjoin the foreclosure sale pursuant to Md. Rule 14-211. In their motion, the Sharmas contended that any responsive legal claim in a foreclosure proceeding should be heard and decided before the equitable claims. As to the legal issue, the Sharmas argued that the circuit court should dismiss or stay the foreclosure action primarily because Ventures Trust brought the foreclosure action without being licensed as a collection agency. As such, the Sharmas contended that Ventures Trust violated MCALA and MCDCA. The Sharmas further asserted in their motion that Ventures Trust could not obtain relief because of a ruling by the Court of Special Appeals, which held that a judgment obtained by an unlicensed entity acting as a collection agency is void. *See Finch*, 212 Md. App. at 759.

The substitute trustees filed an opposition to the homeowners' motion on behalf of Ventures Trust. In the opposition, the substitute trustees contended that the Sharmas failed to specify a relevant defense, such as a violation of the Maryland Rules or Maryland mortgage foreclosure laws. In addition, Ventures Trust's substitute trustees argued that Ventures Trust falls within the trust companies exemption to MCALA and, as such, is not subject to the licensing requirements under MCALA. Based on this argument, Ventures

---

relief against all of the counter defendants as well as one count for accounting against Ventures Trust.

Trust maintained that it was entitled to bring the foreclosure action without first having to obtain a MCALA license.[6]

The Circuit Court for Montgomery County held a motions hearing, during which the presiding judge heard arguments on the Sharmas' motion and Venture Trust's opposition thereto. On August 28, 2015, the circuit court issued an order, granting the Sharmas' motion and dismissing the foreclosure proceeding without prejudice. In a corresponding opinion, the circuit court reasoned that the legislature specifically and explicitly referred to foreign statutory trusts in certain sections of the Maryland Code but decided not to list foreign statutory trusts as an excepted entity from the MCALA requirements. Therefore, the circuit court found that the legislature intentionally omitted the term foreign statutory trusts from the MCALA sections of the Maryland Code. Moreover, the circuit court found that Ventures Trust failed to provide any convincing evidence that they constituted a trust company, which is one type of entity specifically exempted from MCALA. After determining that Ventures Trust was subject to the MCALA licensing requirements, the circuit court also noted that there was no dispute that Ventures Trust lacked the required MCALA license. As such, the circuit court concluded that the Sharmas established that Ventures Trust had no right to bring the foreclosure action, dismissing the case without prejudice.

---

[6] The trustee and substitute trustees also filed a supplemental memorandum in opposition to defendants' motion to dismiss on June 3, 2015. The Sharmas filed a pleading entitled supplemental authority in support of the motion to dismiss or enjoin the foreclosure sale. However, there is no docket entry date on the Sharmas' supplemental pleading. Neither of the supplemental motions sets forth a new argument.

### ii.    Terrance Shanahan, *et al.* v. Seyed Marvastian, *et al.*

On or about June 23, 2006, Seyed Marvastian ("Mr. Marvastian") obtained a loan in the amount of $1,396,500.00 from Premier Mortgage Funding, Inc. to purchase a home located at 7809 Bradley Blvd., Bethesda, Maryland. The loan was evidenced by a promissory note and secured by a deed of trust. Mr. Marvastian's wife, Mrs. Sima Marvastian, was listed as the record owner of the real property. In 2012, Mr. Marvastian defaulted on the loan after he failed to make payments. Two years after Mr. Marvastian's loan was declared in default, Ventures Trust acquired the mortgage loan and all beneficial interest in the deed of trust as part of a securitized pool of mortgage loans. Several months later, the substitute trustees initiated a foreclosure action in the Circuit Court for Montgomery County to enforce the security interest in the real property. Mr. and Mrs. Marvastian ("the Marvasistans") timely requested foreclosure mediation, which concluded without agreement.

The Marvastians filed a counter complaint against one of the substitute trustees, Terrance Shanahan, as well as MCM, as trustee for Ventures Trust. The counter complaint alleged that Ventures Trust acted as a collection agency as defined under MCALA when it brought a foreclosure action on the defaulted mortgage loan that Ventures Trust had purchased without the required license. BR § 7-301, *et seq.* The counter complaint[7] further

---

[7] Although not relevant to the instant analysis, the counter complaint also alleged that Ventures Trust violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* The counter complaint also included one count for declaratory judgment and injunctive relief against all of the counter defendants as well as one count for accounting against Ventures Trust.

alleged that by attempting to collect mortgage payments from Mr. Marvastian without the required license under MCALA, Ventures Trust violated MCDCA. CL § 14-201, *et seq.*

Along with the counter complaint, the Marvastians filed a Rule 14-211 motion to dismiss and/or stay the foreclosure proceeding pending resolution of legal questions. In their motion, the Marvastians argued that the court should stay the foreclosure proceedings in order to first resolve the legal issues presented in the counter complaint. The Marvastians further argued that any court judgment in favor of Ventures Trust would be rendered void because the entity is not licensed as a collection agency as required by MCALA. The substitute trustee and MCM, as trustee for Ventures Trust, filed an opposition to the homeowners' Rule 14-211 motion to dismiss and/or stay foreclosure proceedings. In their opposition, the substitute trustees argued that adjudicating the counter complaint will not have any effect on the foreclosure action because Ventures Trust is exempt from the licensing requirements under MCALA. The substitute trustees further contended that the Marvastians failed to specify any viable defenses to the foreclosure. In addition, the opposition asserted that the Marvastians' motion was frivolous with the only purpose of delaying the foreclosure.

The circuit court held a motions hearing on March 26, 2015.[8] After hearing arguments from both parties on the Rule 14-211 motion, the Court issued an order dated May 12, 2015, making findings of fact and conclusions of law. Specifically, the order

---

[8] The circuit court also heard arguments on the trustee and substitute trustee's motion to dismiss the counter complaint filed on February 6, 2015 and the Marvastians' opposition thereto filed on February 23, 2015 during the motions hearing held on March 26, 2015.

found that "Ventures Trust did business as a 'collection' agency in Maryland by seeking to collect [Mr. Marvastian's] mortgage debts that it purchased after default through a loan servicer." As such, the order concluded that "Ventures Trust is [] subject to MCALA's licensing requirements for collection agencies" and "none of the Maryland Code's definitions of 'trust company' includes Delaware Statutory Trusts[.]" Ultimately, the circuit court dismissed the foreclosure action without prejudice after concluding that the Marvastians established that Ventures Trust had no right to file the foreclose action.

After the circuit court issued the order, the trustee and substitute trustee filed a motion to alter or amend judgment pursuant to Md. Rule 2-534. Through its trustees, Ventures Trust argued that the circuit court erred in concluding that MCALA applies to foreclosure proceedings and statutory foreign trusts mainly because of the potential conflict between Maryland registration requirements for statutory trusts, Md. Code Ann., Corps. & Ass'ns ("CA") § 12-902(a), and MCALA, BR § 7-301(a). The Marvastians' filed a reply, contending that the circuit court properly concluded that a foreclosure proceeding is a form of debt collection and that Ventures Trust does not fall under the MCALA exemption for trust companies.

On July 22, 2015, the circuit court held a second motions hearing in order to hear arguments on the motion to alter the court's judgment and any opposition thereto. After the second motions hearing, the circuit court issued another order, finding that there is "a clear legislative intent to subject foreign statutory trusts that collect debts in Maryland by bringing foreclosure actions in Maryland courts to MCALA's licensing requirement[.]" The circuit court also found that "MCALA's licensing requirement, Bus. Reg. § 7-301(a),

and the registration requirement of CA § 12-902(a) serve distinct purposes; thus, it is not incongruous for the legislature to subject foreign statutory trusts that bring foreclosure action in Maryland to the former but to exempt them from the latter." As such, the circuit court denied Venture Trust's motion to alter or amend the judgment.

### iii.    Consolidation and Court of Special Appeals

On September 10, 2015, Ventures Trust, through its trustees and substitute trustees, filed a notice of appeal to the Court of Special Appeals in both cases, *i.e.*, the foreclosure actions against the properties owned by the Sharmas and the Marvastians. The Court of Special Appeals consolidated the two foreclosure cases into one appeal and issued a reported opinion on June 6, 2017.[9] *Blackstone v. Sharma*, 233 Md. App. 58, 61, *cert. granted*, 456 Md. 53 (2017). The consolidated appeal involved two questions: (1) whether a party who authorized a trustee to initiate a foreclosure action needs to be licensed as a collection agency under MCALA; and (2) whether the MCALA licensing requirement applies to foreign statutory trusts, such as Ventures Trust. The Court of Special Appeals held that Ventures Trust, as a foreign statutory trust, must meet the licensing requirements under MCALA before bringing a foreclosure action unless some other exception in MCALA applies. The Court of Special Appeals further concluded that the exception for trust companies under MCALA does not apply to Ventures Trust because it does not act as a trustee or operate as a commercial bank under the Black's Law Dictionary 10th ed. 2014

---

[9] The Court of Special Appeals previously issued an identical, unreported version of the opinion on April 17, 2017. *Blackstone v. Sharma*, No. 1524, SEPT.TERM, 2015, 2017 WL 1376699 (Md. Ct. Spec. App. Apr. 17, 2017).

definitions.  *See* BR § 7-102.  As such, the Court of Special Appeals ultimately held that Ventures Trust was barred from bringing the foreclosure action without the MCALA license, affirming the judgment of the Circuit Court for Montgomery County.  Ventures Trust, through its substitute trustees, filed a petition for writ of certiorari to this Court on July 14, 2017.

### B.  Laura O'Sullivan, *et al.* v. Jeffrey Altenburg, *et al.*

On or about March 30, 2007, Jeffrey and Brenda Altenburg ("the Altenburgs") obtained a loan in the amount of $592,250.00 from Bank of America, N.A. ("Bank of America") to refinance their home located at 11810 Tridelphia Road, Ellicott City, Maryland.  The loan was evidenced by a promissory note and secured by a deed of trust. The Alternburgs defaulted on the loan by failing to make a loan payment in 2011.

Four years later, Bank of America assigned all beneficial interest under the promissory note and deed of trust to U.S. Bank Trust, as trustee for LSF9.  In 2016, U.S. Bank Trust appointed substitute trustees, Laura H.G. O'Sullivan, Erin M. Shaffer, Chasity Brown, Lauren Bush, and Rachel Kiefer.  The substitute trustees subsequently initiated a foreclosure action in the Circuit Court for Howard County to enforce the security interest in the real property.

The Altenburgs filed a motion to dismiss the foreclosure action pursuant to Md. Rule 14-211.[10]  In their motion to dismiss, the Altenburgs argued that LSF9 did not have any legal right to pursue the foreclosure action because the entity lacked the required

---

[10] The Altenburgs also filed a supplement to the motion to dismiss on May 5, 2016.

14

MCALA license. Moreover, the Altenburgs contended that any judgment in favor of LSF9, acting as an unlicensed debt collector, would be void. *See Finch*, 212 Md. App. at 759. The Altenburgs also asserted that LSF9 does not constitute a trust company, which is one entity exempted from the MCALA licensing requirement. In response, the substitute trustees filed an opposition to the motion to dismiss, arguing that MCALA does not apply to *in rem* proceedings in which substitute trustees pursue the right to foreclose on real property pursuant to a deed of trust. The substitute trustees further asserted that LSF9 constitutes a trust company, which is specifically exempted from MCALA, because a foreign statutory trust could easily fit within the broad, undefined phrase.

The circuit court held a hearing on the Altenburgs' motion to dismiss and opposition thereto. During the motions hearing, the parties argued as to whether certain facts should be stipulated. As a result, the circuit court scheduled a second motions hearing at a later date to allow the parties time to either stipulate to certain facts or to file discovery requests. On July 13, 2016, the parties filed a pleading, stipulating to the fact that LSF9 "acquired the Promissory Note ('Note') secured by the Deed of Trust that is the subject to this action for a sum less than the total amount remaining due on the Note on the date on which LSF9 acquired the Note."

The circuit court held a second motions hearing, during which the court heard additional arguments on the motion to dismiss the foreclosure action. At the end of the second motions hearing, the circuit court made oral findings of fact and conclusions of law on the record. The court specifically concluded that the instant action constituted a consumer claim and that LSF9 required a license under MCALA before bringing the

15

foreclosure action. As such, the circuit court further found that LSF9 did not have the ability to bring the foreclosure action because the foreign statutory trust did not have a license under MCALA at the time it initiated the action. For those reasons, the court granted the Altenburgs' motion to dismiss. The circuit court entered an order dated August 25, 2016, dismissing the action without prejudice. The substitute trustees filed a timely notice of appeal to the Court of Special Appeals. Before the Court of Special Appeals could hear oral arguments, however, the intermediate appellate court issued its reported opinion in *Blackstone v. Sharma*, 233 Md. App. 58, 61, *cert. granted*, 456 Md. 53 (2017). As such, the substitute trustees filed a petition for writ of certiorari with this Court on August 4, 2017.

## C. Martin Goldberg, *et al.* v. Martha Neviaser, *et al.*

On or about October 2, 2007, Marvin and Martha Neviaser ("the Neviasers") obtained a loan in the amount of $171,000.00 from Countrywide Bank, FSB, to refinance their home located at 18103 Maze Lane, Knoxville, Maryland. The loan was evidenced by a promissory note and secured by a deed of trust. The Neviasers defaulted on the loan in 2009 when they failed to make a loan payment. Six years later, Bank of America, as successor by merger to Countrywide Bank, FSB, transferred all interest in the Neviasers' loan to LSF9. In 2015, LSF9 assigned the deed of trust to U.S. Bank Trust, as trustee for LSF9. The trustee, in turn, appointed substitute trustees, Martin S. Goldberg, Doreen A. Strothman, Virginia S. Inzer, William K. Smart, and Taryn L. Alvey. The substitute

16

trustees subsequently initiated a foreclosure action in the Circuit Court for Washington County to enforce the security interest in the real property.[11]

On November 8, 2016, the Neviasers filed a motion to dismiss the foreclosure case.[12] The Neviasers argued that LSF9 was required to have a license under MCALA before initiating the foreclosure action because they acquired a debt in default and then attempted to collect on that debt through foreclosure. Moreover, the Neviasers contended that LSF9 is not exempt from MCALA under the trust company exception because it is not an incorporated entity engaged in banking. In addition to these arguments, the Neviasers urged the circuit court to conclude that LSF9 is estopped from obtaining a different result in the present action than the judgment by the Circuit Court for Howard County in the Alternburgs' case, discussed *supra*. In response, the substitute trustees filed an opposition to the motion to dismiss the foreclosure case, making four arguments: (1) LSF9 was not doing business in the State as defined under MCALA when it brought the foreclosure action; (2) LSF9 was not engaging in the business of a collection agency; (3) LSF9 fell under MCALA's trust company exemption; and (4) the rule of lenity required that any

---

[11] The record reflects that the Neviasers filed a request for foreclosure mediation on April 21, 2016. The parties attended foreclosure mediation on August 23, 2016, at which time the parties agreed to extend the time for mediation by thirty days. The parties attended a second mediation on October 25, 2016, at which time the parties reached an agreement contingent on a future event within thirty days. It appears from the record that the Neviasers filed the motion to dismiss while the contingent mediation was pending.

[12] The Neviasers' motion to dismiss also included an alternative request to stay the foreclosure sale pending resolution of a class action case against the secured parties filed in the United States District Court for the District of Maryland. As the Circuit Court for Washington County dismissed the foreclosure sale without consideration of the Neviasers' alternative request for stay, this issue is not relevant to the instant appeal.

ambiguity in the coverage of MCALA favors a ruling for LSF9 because the act contains criminal penalties.

The court held a motions hearing, at which time the judge heard arguments from the Neviasers and the substitute trustees as to whether the foreclosure proceeding should be dismissed. After the hearing, the court held the matter *sub curia*. By memorandum order, the circuit court concluded that the foreclosure proceedings constituted consumer claims under MCALA. Moreover, the court determined that LSF9 was in the business of collecting consumer claims because the entity indirectly attempted to collect on a defaulted mortgage that it purchased at a discount. The court also rejected LSF9's argument that the trust company exemption under MCALA applied or that the rule of lenity resolved any ambiguities in LSF9's favor. Ultimately, the court granted the Neviasers' motion and dismissed the case without prejudice. The substitute trustees filed a timely notice of appeal to the Court of Special Appeals. Before the Court of Special Appeals could hear oral arguments, however, the intermediate appellate court issued its reported opinion in *Blackstone v. Sharma*, 233 Md. App. 58, 61, *cert. granted*, 456 Md. 53 (2017). As such, the substitute trustees filed a petition for writ of certiorari with this Court on August 4, 2017.

### D. Court of Appeals of Maryland

On September 12, 2017, this Court granted certiorari in each of the above cases. *Blackstone v. Sharma*, 456 Md. 53 (2017);[13] *O'Sullivan v. Altenburg*, 456 Md. 56 (2017);

---

[13] This citation constitutes the cases consolidated in the Court of Special Appeals: (1) *Blackstone v. Sharma*; and (2) *Shanahan v. Marvastian*.

*Goldberg v. Neviaser*, 456 Md. 54 (2017). This Court accepted separate briefs in each of the appeals.[14] Moreover, this Court scheduled individual oral arguments for each of the three cases. The parties presented six questions for our review, which we have rephrased as follows:

1. Whether a foreign statutory trust seeking a mortgage foreclosure action, which is a purely *in rem* proceeding against the subject real property, constitutes a "consumer claim" for "money owed" under MCALA?
2. Whether a foreign statutory trust filing a mortgage foreclosure action, which by statute is not "doing business in this State," nevertheless is "doing business as a collection agency in the State" under MCALA?
3. Whether the Court of Special Appeals' previous ruling in *Finch v. LVNV Funding, LLC*, 212 Md. App. 748, 759 (2013) – *i.e.*, that a judgment in favor of an unlicensed debt collection agency is void as opposed to voidable – should apply to mortgage foreclosure judgments?
4. Whether the circuit court can dismiss a foreclosure action because a foreign statutory trust lacks a collection agency license under MCALA, despite established Maryland authority holding that entities, such as a trustee of the trust and its duly appointed substitute trustees, may enforce a promissory note indorsed in blank in their possession, regardless of who owns the debt or the foreign statutory trust's legal status?
5. Whether a foreign statutory trust pursuing a foreclosure is "doing business as a collection agency" in Maryland under MCALA?
6. Whether a foreign statutory trust that owns mortgage assets falls within MCALA's "trust company" exemption?

Questions 1, 2, 4, and 5 above require this Court to first answer one question: Did the Maryland General Assembly intend to require foreign statutory trusts, one of the

---

[14] Along with their brief to this Court, Martha and Marvin Neviaser filed a Motion to Strike the substitute trustees' Opening Brief and Appendix on October 10, 2017. The substitute trustees filed an Opposition to the Motion to Strike on October 20, 2017. By Order on October 30, 2017, this Court deferred ruling on the Motion and Opposition until after oral argument. This Court now denies the Motion to Strike as part of this opinion.

19

entities in the mortgage industry, to obtain a collection agency license pursuant to MCALA before pursuing an *in rem* foreclosure proceeding? This is the ultimate question before this Court. By answering this question in the negative, this Court does not need to reach questions 3 and 6, both of which are questions that inherently and incorrectly assume that the MCALA licensing requirement applies to foreign statutory trusts like Ventures Trust and LSF9.

## STANDARD OF REVIEW

Generally, the "standard of review of the grant or denial of a motion to dismiss is whether the trial court was legally correct." *Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 284 (2018) (citing *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643–44 (2010)). Specific to foreclosure actions, Md. Rule 14-211 states that the borrower "may file in the action a motion to stay the sale of the property and dismiss the foreclosure action." Md. Rule 14-211(a). In addition, the rule instructs circuit courts how to make a final determination:

> After the hearing on the merits, **if the court finds** that the moving party has established that the lien or the lien instrument is invalid or **that the plaintiff has no right to foreclose in the pending action, it shall grant the motion and, unless it finds good cause to the contrary, dismiss the foreclosure action. If the court finds otherwise, it shall deny the motion.**

Md. Rule 14-211(e) (emphasis added).

In each of the cases below, the circuit courts concluded that the substitute trustees were unable to bring the foreclosure action on behalf of the foreign statutory trust because the trust did not have a collection agency license under MCALA. To that end, the circuit

courts determined that the foreign statutory trusts were engaged in the business of a collection agency by acquiring a mortgage loan in default and then having substitute trustees pursue a foreclosure action to collect that mortgage debt. The circuit courts subsequently granted each of the mortgagor's motions, dismissing the foreclosure proceedings. As these determinations constitute issues of law, this Court will review the circuit courts' decisions to grant the various motions to dismiss *de novo*. *See e.g.*, *Anderson v. Burson*, 424 Md. 232, 243 (2011); *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 578 (2014). In our review, we will "accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party[.]" *Sprenger v. Pub. Serv. Comm'n of Maryland*, 400 Md. 1, 21 (2007) (quoting *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 475 (2004)).

## DISCUSSION

The main dispute between the parties in this case involves the proper interpretation of MCALA as revised by the 2007 departmental bill. The petitioners in these consolidated cases, the substitute trustees of the foreign statutory trusts, each make slightly nuanced arguments as to why the foreign statutory trusts did not need to obtain a license under MCALA before the substitute trustees filed foreclosure proceedings on the trusts' behalf. Specifically, the substitute trustees of Ventures Trust, the foreign statutory trust that owned the mortgage loans obtained by the Sharmas and the Marvastians, contend that entities do not need an MCALA license when pursuing an *in rem* foreclosure action because such a proceeding is brought against the property rather than for money owed on a consumer debt. In addition, Ventures Trust's substitute trustees assert that requiring a foreign statutory

21

trust foreclosing on a mortgage to obtain a license under MCALA for "doing business" as a collection agency would conflict with the Corporations & Associations Article of the Maryland Code, which states that foreign statutory trusts are not doing business in the State by foreclosing mortgages and deeds of trust. *See* CA § 12-908(a)(5). The substitute trustees of Ventures Trust finally argue that requiring foreign statutory trusts to obtain a license under MCALA will not ultimately protect consumers because foreign statutory trusts do not have employees or offices; instead, the trusts act only through trustees and substitute trustees. *See Deutsche Bank Nat. Tr. Co. v. Brock*, 430 Md. 714, 718 (2013).

Substitute trustees of LSF9, holder of the Altenburgs' and Neviaser's mortgage loans, make slightly different arguments before this Court. First, LSF9 substitute trustees contend that the entities that either need to be licensed or exempted pursuant to MCALA are the trustees (who appoint the substitute trustees), the substitute trustees (who pursue the foreclosure proceeding), and the mortgage loan servicer (who contacts the debtor). To that end, the substitute trustees for LSF9 argues that the licensure of the foreign statutory trust (a repository that owns the mortgage loans) is irrelevant because these entities do not act or conduct any business. The substitute trustees further assert that "doing business" is a legal term of art that can be interpreted by looking to the phrase's definition found within other articles of the Maryland Code. Furthermore, the substitute trustees argue that foreclosure proceedings are not consumer claims as defined under MCALA and that statutory trusts are not engaging in the business of debt collection by having substitute trustees pursue a foreclosure action. The LSF9 substitute trustees also urge this Court to interpret MCALA's exemption for trust companies to include foreign statutory trusts.

22

In response, the defaulting homeowners argue that the plain language of MCALA unambiguously requires any person or entity that collects a consumer claim, if the claim was in default when the party acquired it, to have a collection agency license. Specifically, the respondents contend that the legislature could have intentionally added an exemption for foreign statutory trusts under MCALA, but chose not to do so. In undertaking the statutory interpretation, the borrowers in default assert that other statutes are not relevant to this Court's analysis. Moreover, the respondents argue that the petitioners have conceded that a foreign statutory trust is simply an account, requiring a finding by this Court that such an account cannot fall under the exemption for trust companies. The defaulting homeowners also urge this Court to apply Maryland's longstanding principle that unlicensed persons will not be given the assistance of the courts when the person has not obtained a license for conducting certain business required by statute. As becomes clear by the parties' various arguments, this Court must conduct a statutory interpretation analysis.

"This Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Phillips v. State*, 451 Md. 180, 196 (2017).

When conducting a statutory construction analysis, we begin "with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Schreyer v. Chaplain*, 416

23

Md. 94, 101 (2010) (quoting *Adventist Health Care Inc. v. Maryland Health Care Comm'n*, 392 Md. 103, 124 n. 13 (2006)). When the "words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia[.]" *State v. Bey*, 452 Md. 255, 266 (2017). Moreover, after determining a statute is ambiguous, "we consider the common meaning and effect of statutory language in light of the objectives and purpose of the statute and Legislative intent." *Stachowski v. Sysco Food Servs. of Baltimore, Inc.*, 402 Md. 506, 517 (2007).

Even in instances "when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language." *State v. Roshchin*, 446 Md. 128, 140 (2016). *See also Shealer v. Straka*, __ Md. ___, ___, No. 38, Sept. Term, 2017, 2018 WL 1959440, *7 (Apr. 26, 2018).

In addition to legislative history, "[w]e may and often must consider other 'external manifestations' or 'persuasive evidence," in order to ascertain the legislative purpose behind a statute. *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 515 (1987). Specifically, this Court should consider the context of the bill, including the title and function paragraphs, the amendments to the legislation, as well as the "bill request form[.]" *Id.* This Court may also analyze the statute's "relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of

24

legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Id.*

In the event the language of a statute is ambiguous, we will often apply rules of statutory construction to ascertain the intent of the legislature. One such rule is to read the language of a statute in such a way that "will carry out its object and purpose." *Harbor Island Marina, Inc. v. Bd. of Cty. Comm'rs of Calvert Cty., Md.*, 286 Md. 303, 311 (1979). This Court will also "consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Spangler v. McQuitty*, 449 Md. 33, 50 (2016) (quoting *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins, LLC*, 412 Md. 308, 315 (2010)).

In this case, therefore, we must determine if the General Assembly intended to require foreign statutory trusts, such as Ventures Trust and LSF9, to obtain a collection agency license under MCALA before substitute trustees file a foreclosure action on the trust's behalf.

## A.   *Plain Language*

Pursuant to our longstanding statutory interpretation case law, we will first analyze the plain language of the statute in discerning the issue before this Court. MCALA generally requires that "a person must have a license whenever the person does business as a collection agency in the State." BR § 7-301(a). The Act defines collection agency as follows:

25

(d) "Collection agency" means a person who engages directly or indirectly in the business of:

   (1)(i) collecting for, or soliciting from another, a consumer claim; or
   (ii) collecting a consumer claim the person owns, if the claim was in default when the person acquired it;
   (2) collecting a consumer claim the person owns, using a name or other artifice that indicates that another party is attempting to collect the consumer claim;
   (3) giving, selling, attempting to give or sell to another, or using, for collection of a consumer claim, a series or system of forms or letters that indicates directly or indirectly that a person other than the owner is asserting the consumer claim; or
   (4) employing the services of an individual or business to solicit or sell a collection system to be used for collection of a consumer claim.

BR § 7-101(d). Under MCALA, a consumer claim is defined as a claim "for money owed or said to be owed by a resident of the State" and "arises from a transaction in which, for a family, household, or personal purpose, the resident sought or got credit, money, personal property, real property or services." BR § 7-101(f).

The key provisions of MCALA require a person to have a license "whenever the person does business as a collection agency[.]" BR § 7-301(a). Perhaps most significant to the instant appeal is the new language from the 2007 departmental bill that includes an entity that "engages directly or indirectly in the business of . . . collecting a consumer claim the person owns, if the claim was in default when the person acquired it" to the definition of collection agency. BR § 7-101(d).

The General Assembly also limited the scope of MCALA by listing entities exempted from the statute all together. *See* BR § 7-102(b). Specifically, the statute "does not apply to" many of the mortgage industry actors, including "(1) a bank; (2) a federal or

State credit union; (3) a mortgage lender; . . . (5) a licensed real estate broker, or an individual acting on behalf of the real estate broker, in the collection of rent or allied charge for property; (6) a savings and loan association; (7) a title company as to its escrow business; (8) a trust company; [and] (9) a lawyer . . . ." *Id.* However, the statute does not define any of the exempted entities.

On the one hand, this Court cannot ignore that the term "collection agency" is commonly understood as those entities with a business model of sending letters to debtors, making collection calls, and filing collection suits for consumer debt. *See* Alexander Gordon, IV, FEDERAL INTERVENTION IN THE MORTGAGE MARKETS, Maryland State Bar Association Inc., GOMF MD-CLE 1707 (2004) ("traditional debt collection activities (sending dunning letters, making collection calls to consumers)"); *Finch v. LVNV Funding, LLC*, 212 Md. App. 748, 752 (2013) (involving a collection agency named LVNV Funding, LLC that brought collection suits against consumers who accumulated credit card debt in district court without first obtaining a license under MCALA). This ordinary meaning of collection agencies aligns with a majority of the collection agency definition under MCALA. *See* BR § 7-101(d)(1)(ii); (2)–(4) (defining collection agencies as those engaged directly or in directly in the business of: collecting for, or soliciting from another, a consumer claim; collecting a consumer claim the person owns, using a name or other artifice that indicates that another party is attempting to collect the consumer claim; giving or using, for collection of a consumer claim, a series or system of forms or letters that indicates that a person other than the owner is asserting the consumer claim; and employing

27

the services of an individual or business to solicit or sell a collection system to be used for collection of a consumer claim).

On the other hand, however, this commonly understood meaning does not necessarily comport with the prong of MCALA's definition of collection agencies added by the 2007 departmental bill: "a person who engages directly or indirectly in the business of . . . collecting a consumer claim the person owns, if the claim was in default when the person acquired it[.]" BR § 7-101(d)(1)(ii). Reading this language alone, it is unclear whether the General Assembly intended to move away from the ordinary meaning of collection agencies. Moreover, the statutory language excerpted above is undoubtedly capable of more than one reasonable interpretation. *See Barbre*, 402 Md. at 173. This language, especially when considering that it includes entities that act "indirectly," could mean that any individual who obtains a single defaulted debt and pursues one lawsuit or contacts the debtor once to collect that debt engages in the business of a collection agency and is required to obtain a license before doing so. BR § 7-101(d). In the alternative, the language added by the 2007 departmental bill could signify that the General Assembly intended to license those businesses that are commonly understood to be collection agencies that were also buying defaulted consumer debt.

In addition to the conflict between the common understanding of collection agencies and the language added by the 2007 departmental bill, MCALA also includes the phrase "engages directly or indirectly in the business of[.]" BR § 7-101(d). The Court of Special Appeals has previously recognized the ambiguity of this phrase in *Old Republic Ins. Co. v. Gordon*, 228 Md. App. 1, 17 (2016). In *Gordon*, the intermediate appellate court analyzed

28

whether an insurance company pursuing a subrogation right constitutes doing business as a collection agency, requiring the company to obtain a license under MCALA. *Id.* at 2, 13. Specifically, the Court of Special Appeals examined the phrase "in the business of," noting the "dearth of authority in Maryland addressing the meaning of the phrase[.]" *Id.* After evaluating the "different interpretations of the phrase 'in the business of,'" the Court of Special Appeals concluded "that the language of the statute is ambiguous in the context of the issue presented here." *Id.* at 18.

The Court of Special Appeals was correct that this Court has never explicitly opined on the meaning of the phrase "in the business of" let alone the more specific MCALA phrase "engages directly or indirectly in the business of[.]" BR § 7-101(d). However, we have previously analyzed the meaning of the word "business." In *Zurich Insur. Co. v. Friedlander*, this Court specifically analyzed the meaning of "business" as used in an exclusionary clause. 261 Md. 612, 616–17 (1971). This Court opined:

> The ordinary and customary meaning is that reflected in Webster's Third New International Dictionary as 'commercial or mercantile activity customarily engaged in as a means of livelihood' or **two definitions given by Funk and Wagnall's New Standard Dictionary of the English Language:**
> > **'1. A pursuit or occupation that employs or requires energy, time or thought; trade, profession, calling.**
> > **2. Any occupation connected with the operations and details of trade or industry,**'

*Id.* (Emphasis added). We then confirmed that the "Funk and Wagnall's definition of business . . . has been used by various courts as a test of whether one was or was not engaged in a business." *Id.* at 617.

Applying that definition of "business" as used in MCALA to the consolidated cases before us presents further ambiguity. Specifically, the foreign statutory trusts that own the mortgage loans in the cases *sub judice* do not have any employees or offices, do not have any registered agent, and do not have any specifically identified pursuit in the State of Maryland. Instead, LSF9 and Ventures Trust both act solely through trustees and substitute trustees. Therefore, it would be hard for this Court in the first instance to conclude that the foreign statutory trusts engage, either directly or indirectly, in the business of a collection agency when it is hard to deduce if these entities are even conducting "business" under Funk and Wagnall's definition.[15]

The defaulting homeowners contend that MCALA's definition of consumer claim is unambiguous and resolves the issue before this Court.[16] Specifically, MCALA defines

---

[15] *See* the discussion of special purpose vehicles and repositories that play a particular role in the mortgage industry *infra* at 52–54. *See also* the discussion of a conflict between the homeowners' interpretation of MCALA and the Maryland Statutory Trust Act *infra* at 58–59.

[16] The respondents also argue that this Court should give considerable weight to the Board's interpretation of MCALA's licensing requirement. Specifically, the defaulting homeowners point this Court to an advisory notice and a FAQs sheet prepared by the Board for trusts applying for the collection agency license. The advisory notice was issued on July 5, 2007, just after the legislative session that passed the 2007 departmental bill and can be found at: https://www.dllr.state.md.us/finance/advisories/archive.shtml. The notice repeats the same departmental bill language that is fully interpreted by this Court in the legislative intent analysis below. The FAQs sheet was prepared in October 2017, just before the instant appeal came before this Court, and can be found at: http://www.dllr.state.md.us/finance/industry/frnmlstrantrustfaqs.pdf. However, this Court has repeatedly stated that an agency's interpretation of a statute is not binding upon courts. *See, e.g.*, *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Maryland*, 305 Md. 145, 161 (1986); *Sinai Hosp. of Baltimore, Inc. v. Dep't of Employment & Training*, 309 Md. 28, 46 (1987); *Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 529 n.3 (2004). Although this Court often accords deference to an agency's interpretation of its

30

consumer claim to include a claim that "is for money owed or said to be owed" and "arises from a transaction in which . . . the resident sought or got . . . **real property**[.]" BR § 7-101(f) (emphasis added). Though the borrowers may be correct that certain real property transactions or other consumer loans involving property fall within this definition, that is not the crucial question presented in this appeal. This Court must instead determine whether the General Assembly intended to license certain actors in the mortgage industry, such as foreign statutory trusts, as opposed to solely those actors in the collection agency industry.

Just as the Court of Special Appeals determined in *Gordon*, this Court concludes that the plain language of MCALA is ambiguous "in the context of" whether a foreign statutory trust that owns a defaulted mortgage debt falls under the scope of MCALA when a substitute trustee brings a foreclosure action on the trust's behalf.[17] *Id.* We cannot

---

administering statute, we have also made clear that an "important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute." *Baltimore Gas & Elec. Co.*, 305 Md. at 161. After the circuit courts and the Court of Special Appeals ruled in the cases below, the Board simply instructed trusts on how to apply for a license rather than conducting a full analysis of the original collection agencies licensing act or the 2007 departmental bill.

[17] This Court does not ignore the United States District Court for the District of Maryland cases that conclude the language of MCALA is unambiguous in that a passive debt purchaser, including foreign statutory trusts, must obtain an MCALA license before pursuing a foreclosure action. *See Bradshaw v. Hilco Receivables, LLC,* 765 F.Supp.2d 719, 726–27 (D. Md. 2011); *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 523 (D. Md. 2013); *Altenburg v. Caliber Home Loans, Inc.*, No. CV RDB-16-3374, 2017 WL 2733803, at *6 (D. Md. June 26, 2017). However, the federal courts "are bound by the interpretation given by this Court to a Maryland statute[.]" *Am. Radiator & Standard Sanitary Corp. v. Mark Eng'g Co.*, 230 Md. 584, 588 (1963).

determine from the plain language alone if the legislature intended the MCALA licensing requirement to apply to a foreign statutory trust that obtained a defaulted mortgage loan, after which a substitute trustee filed a foreclosure action to protect the trust's security interest. This Court will, therefore, consider the legislative history, subsequent legislation, and related statutes in order to discern the intent of the General Assembly when it enacted the original MCALA statute and any pertinent revisions. *See Kaczorowski*, 309 Md. at 515.

## B.    *Legislative History*

In 1977, the General Assembly enacted the first collection agency licensing statute, which generally instructed that a "person may not engage in the business of a collection agency in this State without an annual license[.]" 1977 Md. Laws, ch. 319. The statute also created the Collection Agency Licensing Board responsible for licensing collection agencies and enforcing the Maryland Consumer Debt Collection Act. 1977 Md. Laws, ch. 319. Senate Bill 435 of 1977 specifically defined "Collection Agency" as:

> all persons directly or indirectly engaged in the business of soliciting from, or collecting for others any claim due or asserted to be owed or due, to a seller, lender, holder, or creditor, arising from transactions involving a Maryland resident seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes.

*Id.*

The original legislation further clarified that a "'Collection Agency' includes any person who gives away, sells, or attempts to give away or sell to others, any system or series of letters or forms used in the collection of claims which assert or indicate, directly

32

or indirectly, that the claim is being asserted or collected by any person other than the creditor or owner of the claim." *Id.* The 1977 collection agencies licensing statute indicated that:

> (2) "Collection Agency" does not include any:
> (I) Regular employee of a creditor acting under the general direction and control of that creditor in the collection of a claim owned by that creditor;
> (II) Regular employee of a collection agency licensed under this subtitle;
> (III) **Bank, trust company, savings and loan association, or building and loan association or mortgage banker**;
> (IV) Abstract company doing an escrow business;
> (V) Attorney at law; or
> (VI) Any person acting under the order of any court of competent jurisdiction.

*Id.* (Emphasis added).

The language of the initial collection agency licensing statute conveys that the General Assembly originally intended only to require licensure for third party collection agencies that collect or solicit the debt of others or sells a system by which to collect debt. The 1977 legislation also included similar exemptions as the present version of MCALA. Critical to this analysis, the legislature grouped together a subsection of exempted actors for banks, trust companies, savings and loan associations, as well as building and loan associations, and mortgage bankers. The plain language of the original legislation provides this Court with evidence that the General Assembly exempted all of these parties with a similar consideration relating to the mortgage industry. *See id.*

33

In addition to the plain language, the Fiscal Note for Senate Bill 435 emphasized that the "bill prohibits any person from engaging in the business of a collection agency in the State of Maryland without an annual license[.]" Dep't Fiscal Servs., *Fiscal and Policy Note, Senate Bill 435*, at 1 (1977 Session) (hereinafter cited as "SB 435 Fiscal Note"). The Fiscal Note further advised that the Department of Licensing and Regulation[18] "assumes that 110 collection agencies will apply for the licensure." *Id.*

The sponsor of the legislation, Senator Clarence W. Blount, submitted written testimony in support of the bill, stating:

> A survey of 1900 complaints made to the Consumer Protection Division during the first six months of 1976 shows that 3% involve debt collection. This means that they are receiving an average of 2 or 3 calls a week about debt collection. In 9 or 10 of these cases the Division has issued cease and desist orders. However, the Division reports that they don't go into harassment cases because they are too difficult to prove. They only pursue complaints where they have something in writing to base their case on. . . . In the years that I have worked on this legislation we have managed to resolve most of the differences with the industry[.]

Senator Clarence W. Blount, *Senate Bill 435, Re: Licensing of Debt Collection Agencies*, Hearing on Senate Bill 435 Before the Economic Affairs Comm. of the Senate, 1977 Leg., 383th Sess. (Md. 1977) (written testimony of Senator Clarence W. Blount) (hereinafter cited as "Senator Blount Testimony"). Senator Blount stressed the urgent "need for this legislation" largely because the "present conditions, inflation, the high rate of

---

[18] The Department of Licensing and Regulation is the predecessor to DLLR. Specifically, the Department of Licensing and Regulation served Maryland between 1970 – 1995. Then in 1995, Maryland established the Department of Labor, Licensing, and Regulation, which this opinion refers to as the Department or DLLR.

unemployment, and the layoffs and hardships" have led to "[m]ore cases of abuse" by collection agencies. *Id.*

Senator Blount also testified regarding the exempted actors. Specifically, Senator Blount indicated in his written testimony that "[e]xcluded from the licensure requirement are regular employees of a creditor or collection agency, banks, and savings and loan association, abstract [title] companies, lawyers, and those acting under court order. . . . Mortgage bankers should also be excluded under this section, and I have an amendment to do this." *Id.* Indeed, Senator Blount submitted amendments to Senate Bill 435 before the second reading of the bill, which added "mortgage banker" to the list of entities exempted from MCALA. Senator Clarence W. Blount, *Amendments to Senate Bill NO. 435*, Second Reading Bill File Before the Economic Affairs Comm. of the Senate, 1977 Leg., 383th Sess. (Md. 1977) (hereinafter cited as "Senator Blount Amendments"). On March 21, 1977, the Senate Economic Affairs Committee passed Senate Bill 435 as favorable with amendments, agreeing with Senator Blount that mortgage bankers should be excluded from the MCALA licensing requirements.

Three years after the General Assembly passed Senate Bill 435, the Department of Fiscal Services issued an evaluation report prepared pursuant to the Regulatory Program Evaluation Act of 1978. Dep't Fiscal Servs., *The Collection Agency Licensing Board: An Evaluation Report Prepared Pursuant to the Regulatory Programs Evaluation Act of 1978* (1980) (hereinafter cited as "Evaluation Report"); *see also* 1978 Md. Laws, ch. 808. In an introductory letter to the report, the Department of Fiscal Services explained that the document consisted of an "evaluation of the Maryland Collection Agency Licensing

Board" meant "to assist the Senate Economic Affairs Committee and the House Environmental Matters Committee in preparing their report to the General Assembly." Evaluation Report at 1.

The evaluation report first provided a description of "the Industry," in which the Department of Fiscal Services noted that in "Maryland, only third-party collectors are licensed. Currently, 174 debt collection agencies have received licenses through the Collection Agency Licensing Board of Maryland." *Id.* at 2. The report continued its description of the collection agency industry:

> Collection agencies collect money due to businesses or creditors other than the agency itself. Usually creditors refer to collection agencies accounts that are long overdue and difficult to collect. The service is generally performed on a commission or on a percentage basis. . . . A mail survey of 89 licensed collection agencies in Maryland reveals that most clients are either hospitals, doctors, retail stores or banks. . . . Collection agencies usually attempt to collect debts over the telephone or by mail. Typically, an agency has a telephone bank of employees and a clerical support staff. Most collection agencies are small businesses.

*Id.* at 2-3. In connection with its industry description, the Department of Fiscal Services included a table ("Table 1") in which the Department broke down the clients of collection agencies, listing medical clients, such as doctors and hospitals, as constituting 54% of clients, retail stores as constituting 23% of clients, banks as constituting 10% of clients, and insurance companies, credit card companies, utilities, newspapers, and contractors as constituting 13% of clients. *Id.* at 3.

The Department of Fiscal Services also explained the continued need for regulation. Specifically, the Department noted:

36

Creditors typically refer to collection agencies only the least collectible accounts. Since agencies are compensated only when they collect, this can lead to abuse. Board members mention harassment, abusive language, and attempting to collect debts not owed as the most prevalent forms of abuse in Maryland. Other abuses include misrepresentation, disclosing credit information to third parties, impersonating government officials or attorneys and simulating the legal process. . . . The primary justification for regulation of this industry is the protection of the public.

*Id.* at 7.

This legislative history provides insight into the purpose of the original collection agency licensing statute. Specifically, Senator Blount's testimony confirms that the legislature was acting to license and regulate the collection agency industry after the high number of complaints regarding the industry's harassing practices. Indeed, the bill file makes clear that collection agency harassment was prevalent during this time period in 1976 and 1977 when the rate of unemployment and inflation sharply increased. *See* Senator Blount Testimony. The Fiscal Note also indicated that the Department of Licensing and Regulation only anticipated that 110 collection agencies would be required to apply for a license, which signifies that the legislature had a general idea of the actors involved in the collection agency industry and intended specifically to license and regulate those actors in order to prevent abusive practices. *See id.*; *see also* SB 435 Fiscal Note, at 1. Senator Blount made clear to the Senate Economic Affairs Committee that certain actors would be excluded and that mortgage bankers should be added to those entities exempted from MCALA. *See* Senator Blount Amendments. Overall, the language of the original collection agency licensing statute and the pertinent legislative history indicates that the

scope of the initial licensing requirement was limited to an *industry* of collection agencies, which largely consisted of small businesses collecting medical and retail accounts by contacting debtors via telephone or mail.

In 2007, DLLR requested House Bill 1324, which sought to address new issues under the collection agency licensing act. *See* 2007 Md. Laws, ch. 472. Significant to the instant appeal, the 2007 departmental bill changed the definition of "collection agency" to include "a person who: (1) engages directly or indirectly in the business of: . . . collecting a consumer claim the person owns, if the claim was in default when the person acquired it[.]" *Id.* Once again, the plain language of the legislation does not provide a definitive scope of regulation. In other words, the language of House Bill 1324 does not unambiguously indicate whether DLLR requested the bill in order to expand the scope of MCALA to industries beyond the ordinary understanding of collection agencies. Moreover, it is not clear whether the Department intended to regulate any person who buys a single defaulted account and then pursues a lawsuit to collect that debt. Equally unclear is whether DLLR was simply trying to license certain collection agencies that bought the defaulted accounts before engaging in collection practices. This Court will consider further legislative history to discern the reason the General Assembly revised MCALA in 2007.

This Court has long considered the "bill request form" as part of its legislative intent analysis. *Kaczorowski*, 309 Md. 505, 515 (1987) ("We identified that scheme or purpose after an extensive review of the context of [the contested legislation], which had effected major changes [on the overall statute]. That context included, among other things, **a bill request form**, . . . a bill title, related statutes, and amendments to the bill.") (Emphasis

added) (citations omitted). *See also In re Anthony R.*, 362 Md. 51, 58 (2000); *State v. One 1983 Chevrolet Van Serial No. 1GCCG15D8D 104615.*, 309 Md. 327, 329 (1987).

When a department requests legislation,[19] that department is required to submit a bill request directly to the Governor's office for review and approval.[20] In this case, DLLR submitted a bill request for proposed revisions to MCALA to the Governor's office in 2006.[21] The Department's "Proposal for Legislation 2007 Session" included a section

---

[19] For a bill to be introduced in the General Assembly, it must be sponsored by a member of the Senate or House of Delegates. There is no constitutional provision for the introduction of bills from other sources, such as a citizen's initiative for legislation or draft legislation submitted directly by the voters. However, there are two exceptions to this rule: (1) administration bills, which provide the Governor an opportunity to introduce major initiatives; and (2) departmental bills, which constitute requests from departments and agencies to make revisions to statutes for general housekeeping purposes or to close loopholes. *See* Library and Information Services, Maryland Department of Legislative Services, *Legislative Lingo*, at 5 (defining a departmental bill as a "bill introduced by a committee chairman at the request of the Executive Branch of State government."). As part of a long-standing courtesy provided by custom in the General Assembly, the bills requested by the departments are introduced by committee chairmen as described in the Legislator's Handbook. *See* Department of Legislative Reference, Maryland General Assembly, *Legislator's Handbook*, at 13, 49 (1990).

[20] Since 1969, Maryland Governors have required departments to submit to the Governor's legal or legislative office all proposed departmental bills for approval. This review procedure began when Governor Marvin Mandel instructed "state department heads to submit all legislation they propose to his office first rather than directly to the General Assembly[.]" *Mandel Asks [To] Look At Bills*, THE BALTIMORE SUN (1837–1992), July 17, 1969, ProQuest Historical Newspapers: The Baltimore Sun, at A14. Thus, at the beginning of his first term, Governor Mandel initiated procedure for the review and approval of departmental bills that continues today. *Id.*

[21] House Bill 1324 was not cross-filed; instead, the bill was only introduced in the House of Delegates. As a late-filed bill, it was first referred to the House Rules and Executive Nominations Committee. Once House Bill 1324 was considered there on February 28, 2007, it was re-referred to the Economic Matters Committee. When it passed the House and crossed over to the Senate, it was first referred to the Senate Rules Committee as provided under Senate Rule 32(e).

entitled Summary for Governor's Review that provided an overview of Maryland's collection agency industry as regulated under MCALA:

> Debt collectors/collection agencies are an essential part of commerce when **credit is used to buy goods and services**. Collection activities in regard to commercial debt remain largely unregulated. However, abusive collection practices concerning consumer debt resulted in state and federal **regulation of the activities of collection agencies collecting consumer debt**. In 1978 [sic], Maryland enacted the Collection Agencies Licensing Act, which required any person engaged in the practice of collecting debts for others to be licensed by the State Collection Agency Licensing Board. The Collection Agency Licensing Board is made up of two public members, two industry members and the Commissioner of Financial Regulation. This Board has unanimously recommended that this legislation be adopted.

> Maryland law regulates collection firms that collect debt as agents on behalf of other entities. The law [] does not require licensing for businesses that collect their own consumer debt. **Elements of the collection industry have noted a loophole and now enter into "purchase agreements" in regard to delinquent debt rather than act as an agent for the original creditor. The terms of the purchase contract may closely resemble the terms of a collection agency agreement (the purchase price is primarily a percentage of the amount collected)** etc. Although federal law governs the **collection activities of these firms in collecting "purchased" debt**, **they currently need no Maryland license and the complaint resolution and regulatory action provided to Maryland residents is avoided. "Debt purchasers" circumvent current State collection laws, by engaging in debt collection business** in Maryland without complying with any licensing or bonding requirement. . . .

> This legislative proposal would include debt purchasers within the definition of a "collection agency", [sic] and require them to be licensed by the State Collection Agency Licensing Board before they may collect consumer claims in this State. Businesses that are collecting their own debt continue to be excluded from this law. . . .

40

Secretary James D. Fielder, *Proposal for Legislation 2007 Session*, Department of Labor, Licensing, and Regulation (Md. 2007) (hereinafter cited as "Secretary Proposal for Legislation") (emphasis added).

Here, the department highlights the narrow scope of its request. DLLR requested the 2007 bill specifically to regulate actors in the "collection industry" that employed a loophole in MCALA's licensing requirement by purchasing the delinquent consumer debt for "goods and services" via a purchase contract that "may closely resemble the terms of a collection agency agreement[.]" *Id.* Moreover, the bill request explains that the department considered "debt purchasers" to be those firms engaged in "debt collection business" that were entering into these purchase contracts. *Id.* Therefore, the department clarifies that it did not intend to regulate or license any actors outside the scope of the collection agency industry; rather, DLLR requested the 2007 departmental bill in order to ensure that all actors within that industry were complying with the licensing requirement as well as the "complaint resolution and regulatory action" under MCALA. *Id.*

The bill request also included a Fiscal Estimate Worksheet in which DLLR analyzed the "effect of the proposed legislation on the agency (operations, funding, etc.)." *Id.* (cleaned up). The Department estimated only 40 debt purchasers to become licensed under the 2007 bill and "anticipate[d] a small growth in the number of licensees, approximately 2 new licensees per year." As such, this Court finds unlikely that the Department was proposing regulation of new industries. *Id.* Specifically, DLLR requested this departmental bill in order to close a loophole within the collection agency industry rather

41

than to broaden the scope of MCALA to apply to other industries, such as the mortgage industry.

In addition to the bill request, the purpose paragraph of House Bill 1324 states: "FOR the purpose of altering the definition of 'collection agency' as it **related to the licensing and regulation of collection agencies**; requiring certain additional persons to be licensed by the State Collection Agency Licensing Board **before they may collect consumer claims in this State**[.]" *Id.* (Emphasis added). The language in the purpose paragraph conveys that the General Assembly intended to alter the definition of collection agencies only insofar as it related to the licensing and regulation of the collection agencies seeking consumer debt. Moreover, the purpose paragraph indicates that these additional actors need to obtain a license under MCALA before they "collect consumer claims[.]" Nothing in the purpose paragraph indicates that the General Assembly intended to expand the scope of MCALA beyond the collection agency industries that collect consumer claims. Indeed, nothing in the above language suggests that the departmental bill was enacted for the purpose of regulating and licensing the mortgage industry.

In addition, the Fiscal Note for House Bill 1324 outlines the general purposes of the legislation: the "bill extends the purview of the State Collection Agency Licensing Board to include persons who collect a consumer claim acquired when the claim was in default[.]" *See* Dep't Legis. Servs., *Fiscal and Policy Note, House Bill 1324*, at 1 (2007 Session) (hereinafter cited as "HB 1324 Fiscal Note"). The Fiscal and Policy Note also has key language regarding the scope of the legislation:

42

> DLLR advises that the State Collection Agency Licensing Board currently regulates 1,304 collection agencies. **The department estimates that the bill would make 40 debt purchasers subject to State regulation**. **Debt purchasers are not currently subject to regulation, as they purchase the debt directly from the creditor and are generally compensated as a percentage of their recovery**.

*Id.* at 2 (emphasis added).

Another key legislative history document in the bill file is the floor report.[22] The Floor Report for House Bill 1324 contains the following anticipated question: "What problem is this bill addressing?" Floor Report, House Bill 1324, Collection Agencies - Licensing, Economic Matters Committee of the House of Delegates, 2007 Leg., 423th Sess. (Md. 2007) at 3 (hereinafter cited as "HB 1324 Floor Report"). In response, the Floor Report recommends the Delegate answer as follows:

> Although debt collectors must be licensed in Maryland to collect debts owed to a creditor, currently individuals collecting debts owed to themselves are exempt. Creditors have taken to selling defaulted receivables at a discount to **collectors** who are not licensed under Maryland law[.]

*Id.* (Emphasis added). The Floor Report's answer indicates that the legislature intended to regulate "debt purchasers" who essentially act as "collectors," but avoid the license requirement by purchasing the defaulted account from the creditor before engaging in collection activities.

---

[22] A floor report is a document prepared by the relevant committee's staff, in this case the staff for the House Economic Matters Committee, for the purpose of preparing the Committee Chairman who presents the second reader report on the House floor. Typically, the committee staff will include a section with questions that other Delegates may ask after hearing the second reader as well as suggested responses to those questions.

These legislative history documents convey that the legislature was concerned specifically with certain collection agencies, or "collectors," that own a defaulted account but are still compensated as a percentage of recovery. Floor Report at 3. Indeed, the Department only expected "40 debt purchasers" to become subject to regulation as a result of the 2007 departmental bill. HB 1324 Fiscal Note, at 2. This language affirms that House Bill 1324 did not intend to expand the coverage of MCALA beyond those collection agencies that purchase delinquent consumer debts.

This interpretation is again confirmed by the Department's written testimony submitted by the Commissioner of Financial Regulation and Chairman of the Collection Agency Licensing Board, Charles W. Turnbaugh. The Commissioner encouraged the legislators to issue a favorable report for the bill requested by DLLR, stating:

> Maryland law regulates collection firms that collect consumer debt as agents of the creditor (hospitals, retailers, credit card issuers etc.). The law does not require licensing for businesses that only collect their own consumer debts[.] However, **the evolution of the debt collection industry has created a "loophole" used by some entities as a means to circumvent current State collection agency laws. Entities, such as "debt purchasers" who enter into purchase agreements to collect delinquent consumer debt rather than acting as an agent for the original creditor, currently collect consumer debt in the State without complying with any licensing or bonding requirement.**

Charles W. Turnbaugh, *Testimony in Support of HB 1324*, Hearing on House Bill 1324 Before the Economic Matters Committee of the H.D., 2007 Leg., 423th Sess. (Md. 2007) (written testimony of Charles W. Turnbaugh) (emphasis added) (hereinafter cited as "HB 1324 Turnbaugh Testimony"). The Commissioner's testimony focuses solely on consumer

debt with no mention of expanding MCALA's licensing requirement to the mortgage industry.

In addition to the Chairman of the State Collection Agency Licensing Board, Susan Hayes, who served as one of the consumer members on the Board, provided her perspective in written testimony in support of the 2007 bill. Ms. Hayes indicated that "HB 1324 **closes a loophole in licensing of debt collectors** under Maryland law. **Just because a professional collector of defaulted debt 'purchases' the debt, frequently on a contingent fee basis, should not exclude them from the licensing requirements** of Maryland law concerning debt collectors." Susan Hayes, *Statement on House Bill 1324*, Hearing on House Bill 1324 Before the Economic Matters Committee of the H.D., 2007 Leg., 423th Sess. (Md. 2007) (written testimony of Susan Hayes) (emphasis added) (hereinafter cited as "HB 1324 Hayes Testimony").

A second board member of the State Collection Agency Licensing Board, Eileen Brandenberg, also submitted written testimony in support of the bill. Ms. Brandenberg offered her "perception as a Board member" in her testimony, stating:

> **[T]he majority of serious debt collection problems now are coming from a small number of maverick collectors** and from unregulated newly-evolved kinds of businesses not covered under current licensing laws. Debt purchasers are increasing in number – problems with their debt collection practices need to come under the same regulations that govern other collectors. To keep doing the job of protecting Marylanders we need adequate tools to give us a measure of control over the actions of businesses that now exist to collect consumer debts outside the scope of traditional collection agencies.

**It is frustrating to hear of complaints that are outside our authority only because the purchase of a debt has put the collector outside the current definition of "collection agency."**

Eileen Brandenberg, *Testimony in Support of HB 1324*, Hearing on House Bill 1324 Before the Economic Matters Committee of the H.D., 2007 Leg., 423th Sess. (Md. 2007) (written testimony of Eileen Brandenberg) (emphasis added) (hereinafter cited as "HB 1324 Brandenberg Testimony"). Once again, the testimony of the two State Collection Agency Licensing Board members focused on consumer debt sought by specific collection agencies. Neither of the board members indicated that the departmental bill would require actors within the mortgage industry to obtain a license as a collection agency.

It is also significant that the bill file does not contain any written testimony in opposition of the bill from any other representatives of the mortgage industry, such as Wells Fargo Home Mortgage Servicing, Maryland Mortgage Bankers Association, Mortgage Bankers Association of Metropolitan Washington, Maryland Coalition of Title Insurers, etc. These same representatives, along with other mortgage industry members, submitted written and oral testimony[23] in response to the 2009 foreclosure reform bills.[24] If these same lobbyists believed the 2007 departmental bill required mortgage industry members to obtain a license as a collection agency, then they most assuredly would have

---

[23] For example, the Mid-Atlantic Financial Services Association submitted written testimony in response to Senate Bill 269 in the 2009 regular session of the General Assembly, seeking an amendment clarifying that mortgage loan servicers do not need to be licensed as mortgage loan originators.

[24] Discussed on pages 67-68 *infra*.

submitted written testimony in opposition of the bill or proposed specific amendments excluding those mortgage industry members. It is understandable, however, that these mortgage industry representatives did not file any testimony because all of the bill file documents above indicate that the departmental bill aimed only to clarify that MCALA applies to those collection agencies that were buying defaulted consumer debts before engaging in collection practices to avoid the licensing requirement. Nothing in the bill file suggests that DLLR was requesting the General Assembly to expand their regulating and licensing authority under MCALA to the mortgage industry. Moreover, the language in the purpose paragraph does not provide the mortgage industry with any notice that the departmental bill would be including mortgage industry actors or mortgage loans into the realm of the collection agency industry. This lack of notice would explain why the mortgage industry actors did not submit testimony in opposition to the bill, believing that House Bill 1324 was still limited to "professional collector[s] of defaulted debt." HB 1324 Hayes Testimony.

The 2007 viewpoint of the Commissioner and Board members, who are ultimately responsible for licensing and regulating the collection agencies, is critical to this Court's legislative intent analysis. Ms. Brandenberg emphasized that the issue before the State Collection Agency Licensing Board was a few collection agencies that are outside the scope of authority only because the actors purchased the consumer debt. Similarly, Ms. Hayes supported House Bill 1324 because unlicensed "professional collector[s]" were purchasing defaulted debt and subsequently receiving contingent fees from the original creditor if the debt purchaser successfully collected the debt. Moreover, the

47

Commissioner's testimony highlights that the 2007 departmental bill still focused on regulation of the "collection agency industry," in which certain collection agencies were purchasing debt in order to own the debt and thus avoid the licensing requirement. The legislative history, therefore, highlights that the Board was seeking to regulate those collection agencies that purchased the defaulted consumer debts as a means of avoiding obtaining a license under MCALA. As such, this Court is persuaded that the General Assembly did not intend to significantly enlarge the scope of MCALA to entities outside of the collection agency industry. Instead, the 2007 legislation merely served as a way to regulate those collection agencies that exploited a loophole that occurred when the agency purchased the defaulted account before collecting as owners of the consumer debt.

This Court interprets the legislative history to signify that the General Assembly intended MCALA, when originally enacted and when revised in 2007, to regulate and license the collection agency industry. The legislative history persuades this Court that the General Assembly did not intend to regulate or license the mortgage industry actors, including foreign statutory trusts serving as a repository for mortgage loans, as collection agencies due to the specific exemptions and the limited scope of MCALA. Nevertheless, we will also look to related statutes and subsequent legislation in order to confirm this interpretation.

C.    *MCALA's Relationship with Subsequent and Related Legislation*

In addition to the legislative history, we will also look at "the statute's relationship to earlier and subsequent legislation[.]" *Rose v. Fox Pool Corp.*, 335 Md. 351, 360 (1994). This Court should also consider "the context in which the statute appears . . . and that

48

context may include related statutes[.]" *Mayor & City Council of Baltimore v. Chase*, 360 Md. 121, 129 (2000). This type of comparison can assist this Court in narrowing the purpose and scope of the ambiguous statute. *See Rose v. Fox Pool Corp.*, 335 Md. at 358–59 ("Every statute is enacted to further some underlying goal or purpose—'to advance some interest, to attain some end'—and must be construed in accordance with its general purposes and policies") (quoting *Kaczorowski*, 309 Md. at 513). Moreover, a review of subsequent and related statutes is necessary to determine whether two statutes apply to the same situation. If so, this Court must "attempt first to reconcile them. . . . Thus, if two acts can reasonably be construed together, so as to give effect to both, such a construction is preferred, and the two should be construed together to be interpreted consistently with their general objectives and scope." *Immanuel v. Comptroller of Maryland*, 449 Md. 76, 87 (2016). This Court will, therefore, review and consider subsequent legislation and related statutes enacted by the General Assembly after MCALA, and the pertinent departmental bill, in order to confirm the intended scope of the collection agencies licensing statute.

In response to a foreboding foreclosure crisis, Governor Martin J. O'Malley[25] established the Homeownership Preservation Task Force ("Task Force") on June 13, 2007, just over a month after the General Assembly enacted and the Governor signed the

---

[25] Martin J. O'Malley served as Maryland Governor from January 17, 2007 to January 21, 2015. Previously, Governor O'Malley served as the Mayor of Baltimore from December 7, 1999 to January 17, 2007.

MCALA departmental bill into law.[26] The Task Force was created in response to the rising foreclosure rates occurring in 2006 and 2007. Raymond A. Skinner & Thomas E. Perez, *Final Report of the Maryland Homeownership Preservation Task Force Report*, Maryland Homeownership Preservation Task Force, November 29, 2007 (hereinafter cited as "Task Force Report"). One of the main objectives for the Task Force was examining "current laws and regulations in Maryland governing the mortgage industry and the foreclosure process and recommend[ing] necessary changes, including legislative and regulatory actions where warranted[.]" *Id.* at 3. The Task Force recognized that a full review of the Maryland mortgage foreclosure law was necessary to develop an action plan for addressing the increased foreclosure rates. As a result, the Task Force recommended, in part, that the State strengthen the laws against fraud in mortgage transactions as well as improve Maryland's foreclosure process. *Id.* at 6.

When identifying the causes of the foreclosure problem in Maryland, the Task Force described today's mortgage marketplace.

> Today's mortgage marketplace is quite different. Nearly 70 percent of all homeowners obtain their residential mortgage loans through a broker. In mortgage transactions, non-bank originators, such as brokers, collect fees up front for their services. The broker originates the loan and a lender underwrites the loan. **Often as soon as the loan settles, the loan is packaged with other loans into mortgage backed securities (MBS) to make them attractive to investors.** The homeowner has no connection with the holder of the mortgage note and may not even know who the note holder is. **The**

---

[26] Specifically, the 2007 departmental bill passed the House of Delegates on March 30, 2007 (legislative date March 26, 2007), passed the Maryland Senate on Sine Die, April 9, 2007(legislative date April 3, 2007), and then was signed by the Governor on May 8, 2007.

**loan goes to a servicer who services the loan for the note holder and collects payments and fees from the homeowner**.

*Id.* at 9 (emphasis added). Therefore, the Task Force explained that the current model of the mortgage industry includes: (1) a broker, matching the lender to borrower; (2) a lender, typically a bank; (3) a mortgage backed security, which is typically a package of loans to be sold to investors; and (4) a mortgage loan servicer, who services the loan and collects payments from the borrower.

This "mortgage marketplace," or "mortgage industry," encompasses a "primary and secondary mortgage market" that requires securitization. Robin Paul Malloy, *Mortgage Market Reform and the Fallacy of Self-Correcting Markets*, 30 Pace L. Rev. 79, 82 (2009). After a typical home loan and mortgage, the mortgage lenders often "wish to sell the mortgages that they originate." *Id.* at 95. The secondary mortgage market serves this exact purpose by creating "a market for primary mortgages[.]" *Id.* at 96. Specifically, the secondary mortgage market "enhances liquidity, reduces risk by diversifying the primary lender's investment portfolio, and increases the available funds for lending by recharging the assets of the primary lender." *Id.* at 95–96. The secondary mortgage market intermediaries "buy and sell loans and loan participations, as well as package loans into pools for securitization." *Id.* at 96.

This Court has previously explained the securitization process in detail:

Securitization starts when a mortgage originator sells a mortgage and its note to a buyer, who is typically a subsidiary of an investment bank. **The investment bank bundles together the multitude of mortgages it purchased into a "special purpose vehicle," usually in the form of a trust**, and sells the income rights to other investors. **A pooling and servicing**

**agreement establishes two entities that maintain the trust: a trustee, who manages the loan assets, and a servicer, who communicates with and collects monthly payments from the mortgagors**.

*Anderson v. Burson*, 424 Md. 232, 237 (2011) (emphasis added) (citations omitted). In *Deutsche Bank Nat. Tr. Co. v. Brock*, this Court clarified that a "special purpose vehicle 'is a business entity that is exclusively a repository for the loans; it does not have any employees, offices, or assets other than the loans it purchases.'" 430 Md. 714, 718 (2013) (quoting *Anderson*, 424 Md. at 237 n. 7). *See also* Christopher L. Peterson, *Predatory Structured Finance*, 28 Cardozo L. Rev. 2185, 2261 (2007) ("**In a typical transaction, a third party company is hired to service the loan – meaning collect the debt. Much like a 'debt collector' as defined under federal law, mortgage loan servicers are not chosen by consumers.** A consumer does not have the right to refuse to do business with a company granted servicing rights by a securitization pooling and servicing agreement.") (Emphasis added).

The securitization process of the mortgage industry highlights that a trust, such as a foreign statutory trust, serves a specific purpose in the mortgage industry. Indeed, such trusts are called "special purpose vehicles" because they simply hold the loans managed by the trustees and collected by the mortgage servicers. *See Deutsche Bank*, 430 Md. at 718. In other words, the trust solely constitutes a pool of loans that will eventually be sold off to investors. *See id.* at 2209. The trustees and substitute trustees are the actors that manage and control the trust assets. *See Anderson*, 424 Md. at 237. The mortgage servicer,

as opposed to the statutory trust, acts as the debt collector and interacts with the borrowers. *See* Peterson, 28 Cardozo L. Rev. at 2261.

When examining this mortgage industry model, the Task Force did not mention or discuss MCALA or collection agencies licensing requirements. Instead, the Legal and Regulatory Reform Work Group within the Task Force noted that the mortgage brokers, mortgage lenders, and mortgage servicers can engage in those businesses with a license under the Maryland Mortgage Lender Law. Task Force Report, at 27. The Task Force also recognized that mortgage originators must obtain a separate license under Maryland law. *Id.* at 27. Specifically, the Work Group stated that "there are 6,154 mortgage lending licensees in Maryland and there are 10,493 mortgage originators. . . it is estimated that approximately two-thirds of the mortgage lending licensees, or about 4,120, are brokers." *Id.* These numbers are in stark contrast to DLLR's estimate that 1,304 hold a collection agency license under MCALA. *See* HB 1324 Fiscal Note.

After summarizing the current law, the Task Force made certain recommendations as to licensing and lending. Specifically, the Work Group recommended that "Maryland increase the Commissioner of Financial Regulation's legal and regulatory oversight and enforcement of the mortgage lending industry to strengthen protections for homeowners and ensure the integrity of the industry." Task Force Report, at 25. In addition, the Task Force suggested that Maryland "[e]nact a criminal mortgage fraud statute that would apply to all possible players involved in mortgage transactions and would incorporate a reporting requirement to the Commissioner of Financial Regulation or other licensing body." *Id.* at 33. The Work Group also incorporated specific recommendations for amending the

statutory requirements for the foreclosure process as appears in the Maryland Rules. *Id.* at 35–39.

Pursuant to these recommendations, the General Assembly enacted the proposed foreclosure policy bills during the 2008, 2009, and 2010 legislative sessions that amended the recordation requirements of mortgages, added requirements to the foreclosure process, created a comprehensive mortgage fraud statute to protect homeowners in foreclosure, altered the mortgage lender and mortgage loan originator licensing requirements, and extended legal protections for homeowners in foreclosure and mortgage default. *See e.g.*, 2008 Md. Laws, ch. 1; 2008 Md. Laws, ch. 2; 2008 Md. Laws, ch. 3; 2008 Md. Laws, ch. 4; 2008 Md. Laws, ch. 5; 2008 Md. Laws, ch. 6; 2008 Md. Laws ch. 7; 2008 Md. Laws, ch. 8; 2009 Md. Laws; ch. 4; 2009 Md. Laws, ch. 615; 2010 Md Laws, ch. 485; 2010 Md. Laws, ch. 323. In addition, this Court accepted the proposals of the Standing Committee on Rules of Practice and Procedure ("Rules Committee") to amend the Maryland Rules in 2009 and 2010 in order to strengthen the requirements in foreclosure proceeding filings. *See* One Hundred Sixtieth Report of the Standing Committee on Rules of Practice and Procedure (2009); One Hundred Sixty-Sixth Report of the Standing Committee on Rules of Practice and Procedure (2010). These changes to the Maryland Code and Maryland Rules created a comprehensive scheme, which this Court has referred to as the Maryland mortgage foreclosure law, regulating the actors in the mortgage industry for the purpose of protecting homeowners. *See* RP § 7-101, *et seq.*; Md. Rules 14-201, *et seq.*; Md. Code Regs. 09.03.12.01, *et seq.*

When comparing the legislative history of MCALA, including the 2007 departmental bill, against the almost contemporaneous Maryland mortgage foreclosure law reform, this Court concludes that the General Assembly consciously separated the consumer debt collection agency industry under MCALA from the mortgage industry. *See Rose*, 335 Md. at 360. In other words, the General Assembly did not intend MCALA to be regulating the mortgage industry actors involved in foreclosure proceedings because the legislature addressed that exact issue in the subsequent legislative sessions. *See* 2008 Md. Laws, ch. 1.

Indeed, the Task Force specifically reviewed Maryland laws relating to foreclosure and mortgage industry actors as of 2007 and never mentioned or discussed MCALA or any requirements for a collection agency license. *See generally* Task Force Report. The Task Force, instead, specifically recognized that the current mortgage industry model includes mortgage backed securities, in the form of a foreign statutory trust, and a separate loan servicer, which collects the payments from the homeowners. *Id.* at 9. Moreover, the Work Group concluded that as of 2007 there were approximately 6,154 mortgage lending licensees in Maryland, including 4,120 mortgage brokers, and estimated that there were 10,493 mortgage originator licensees. *Id.* at 27. Comparing these numbers to the Department's estimations regarding the number of current licensed collection agencies and projected licenses makes clear that MCALA was intended to regulate a much smaller industry. As discussed *supra*, DLLR estimated that there were 1,304 licensed collection agencies in 2007, and that the departmental bill would place 40 new debt purchasers under

the Board's regulation with an additional two applications each year. *See, e.g.*, HB 1324 Fiscal Note, at 2; Secretary Proposal for Legislation.

Overall, the subsequent legislation in response to the 2007 Homeownership Preservation Task Force's recommendations confirms that the General Assembly intended to solve two different problems by enacting revisions to MCALA (*i.e.*, to regulate and license certain collection agencies engaged in collecting consumer debts in exchange for a percentage of the debt) and changes to the Maryland Code and Maryland Rules relating to the mortgage industry actors and foreclosure (*i.e.*, to protect homeowners by adding certain requirements to the foreclosure process and heavier regulation of the mortgage industry actors). The complete absence of any discussion of MCALA or collection agencies when the legislature considered the problem of rising foreclosure rates as well as bad practices by certain actors within the mortgage industry persuades this Court that the General Assembly did not intend to license one of the mortgage industry actors, foreign statutory trusts, under MCALA.

After a majority of the Maryland mortgage foreclosure law reform legislation was passed in 2008 and 2009, the General Assembly also enacted the Maryland Statutory Trust Act in 2010. *See* CA § 12-901 *et seq.* A "statutory trust" constitutes any unincorporated business, trust, or association that filed an initial certificate of trust in Maryland and is governed by a governing instrument. CA § 12-101(h). A "foreign statutory trust" is simply a statutory trust that is formed under the laws of another state. CA § 12-101(d). The Statutory Trust Act requires foreign statutory trusts to "register with the State Department of Assessments and Taxation prior to conducting business in the State." Dep't Legis.

56

Servs., *Fiscal and Policy Note, Senate Bill 787*, at 3 (2010 Session). Moreover, all foreign statutory trusts are to submit to certain penalties for failing to register. *Id.*

When passing the 2010 Maryland Statutory Trust Act, the General Assembly recognized that a statutory trust has "general powers" to: make contracts; incur liabilities and borrow money; sell, mortgage, convey, or otherwise dispose of assets; issue notes and secure obligations by mortgage or deed of trust; acquire or purchase or hold interests in real or personal property; purchase, receive, or deal in stock; acquire shares of beneficial interest; invest or lend money; and, sue and be sued in all courts. *Id.* at 2. By specifically noting these general powers, the Fiscal and Policy Note affirms that the legislature understood that statutory trusts serve functions within many different industries. However, the legislature specifically concluded that: "In addition to any other activities which may not constitute doing business in this State, for the purposes of this subtitle, **the following activities of a foreign statutory trust do not constitute doing business in this State** . . . (5) **Foreclosing mortgages and deeds of trust on property in this State**[.]" CA § 12-908(a)(5) (emphasis added).

Therefore, there is a direct conflict between the homeowners' arguments that MCALA requires foreign statutory trusts to obtain a license before engaging in the business of a collection agency by instituting a foreclosure action and the Maryland Statutory Trust Act's recognition that foreign statutory trusts are not doing business in Maryland when foreclosing on a mortgage. As such, these consolidated cases present an instance in which both of the statutes, MCALA and the Maryland Statutory Trust Act, may apply and

conflict.  We have previously explained that when two statutes apply to the same situation, then this Court will attempt to harmonize the statutes.

> We presume that the legislature intends its enactments "to operate together as a consistent and harmonious body of law."  Thus, when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable.  Nevertheless, "if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute."

*State v. Ghajari*, 346 Md. 101, 115 (1997) (citations omitted).

Given the legislative history and the subsequent legislation, this Court can easily give effect to both statutes.  When enacting and revising MCALA, the legislature intended to license a certain group of actors within the collection agency industry, including those entities that purchased delinquent consumer debt in exchange for a contingency fee.  Foreign statutory trusts were not within the purview of the collection agency industry that the General Assembly intended to license.  The year after the General Assembly enacted the 2007 departmental bill, the legislature enacted a comprehensive foreclosure reform, addressing the rising number of foreclosures in Maryland by requiring all entities instituting foreclosure proceedings to comply with specific homeowner protection procedures.  When enacting the Maryland Statutory Trust Act in 2010, the legislature did not require foreign statutory trusts to register with the State when bringing foreclosure actions because the General Assembly appreciated that MCALA was limited to the collection agency industry and the previously enacted foreclosure reform would control the foreclosure proceedings.

58

The defaulting homeowners in these consolidated cases assert that the above language is irrelevant to the present inquiry because the Maryland Statutory Trust Act specifically states that it is only "for purposes of [that] subtitle[.]" CA § 12-908(a). As such, the borrowers contend that the Maryland Statutory Trust Act does not in any way reflect on the General Assembly's intent in enacting and revising MCALA. However, this argument ignores the practical considerations of the legislature. The General Assembly enacted the Maryland Statutory Trust Act in 2010, three years after the departmental bill sought to close a loophole under MCALA and just one year after major foreclosure reform legislation. Needless to say, requiring the statutory trusts to comply with a separate registration system to pursue an *in rem* foreclosure would have been redundant after enacting a comprehensive scheme governing all foreclosure proceedings in Maryland.

When viewing MCALA, the foreclosure reform legislation, and the Maryland Statutory Trust Act together, it becomes clear that the General Assembly sought to regulate and license a separate collection agency industry that assists creditors in obtaining consumer debt (or buys that debt, whether at a discounted price or contingently, to pursue on its own account) when it enacted and revised MCALA. In 2008 and 2009, the legislature enacted specific procedures and requirements for any person, party, or entity seeking an *in rem* foreclosure proceeding. Then in 2010, the General Assembly enacted a registration statute for statutory trusts and foreign statutory trusts under the Maryland Statutory Trust Act. When enacting the Maryland Statutory Trust Act, the legislature specifically exempted the trusts from obtaining registration when simply seeking a foreclosure, recognizing that the previous foreclosure law reform would provide the required

procedures and protections. This reading of the related statutes prevents any direct conflict and gives effect to all of the General Assembly's individual policy goals. *See Immanuel*, 449 Md. at 87.

## CONCLUSION

Although the plain language of MCALA is ambiguous as to whether the General Assembly intended to require licensure for foreign statutory trusts as collection agencies, the legislative history, subsequent legislation, and related statutes provide this Court with strong evidence of legislative intent. Specifically, the broad legislative history conveys that the General Assembly was concerned with abusive practices within the collection agency industry when it enacted the original collection agencies licensing statute. 1977 Md. Laws, ch. 319. When the legislature enacted the first statute requiring collection agencies to obtain a MCALA license, the General Assembly specifically exempted mortgage industry actors. *Id.*

In the years leading up to 2007, the Department recognized that certain collection agencies pursuing consumer debt had found a way to bypass the licensing requirement under MCALA. Specifically, certain members of the collection agency industry were purchasing the debt from their clients, often on a contingent fee basis, so that they would not be a third-party collection agency. In other words, the collection agencies were entering into agreements with their clients in which the agencies agreed to collect the debt they bought as opposed to acting as an agent for the original creditor. These agreements would effectively put the collectors outside of the Board's authority. Therefore, the Department submitted a bill request to the Governor for his consideration of a departmental bill that

60

would close this loophole. DLLR stated in its bill request that the departmental bill aimed to license persons who buy the defaulted debt for "goods and services" before engaging in typical collection practices. Secretary James D. Fielder, *Proposal for Legislation 2007 Session*, Department of Labor, Licensing, and Regulation (Md. 2007).

The Department did not request, and the General Assembly did not intend, to expand the scope of MCALA's licensing requirement to other industries beyond the collection agency industry. There is nothing in the Department's bill request form, the fiscal and policy note, or the written testimonies that suggest DLLR was proposing to license and regulate the mortgage industry by revising the definition of "collection agency" under MCALA. Overall, the legislative history of the 2007 departmental bill reveals that the changes did not intend to expand the scope of MCALA beyond the collection agency industry.

Similarly, there is nothing in the legislative history of the Maryland mortgage foreclosure law reform that suggests the General Assembly considered MCALA to be licensing the mortgage industry actors. In fact, the Task Force, which was created specifically to review the Maryland laws relating to foreclosure as well as suggest changes to that foreclosure law, did not mention MCALA's licensing requirement. The Task Force explained to the General Assembly that the mortgage marketplace often involves packages of loans, called mortgage backed securities. *See generally* Task Force Report. As this Court has explained, securitization requires special purpose vehicles, such as trusts, to serve as a repository for the mortgage backed securities. Both this Court and the Task Force recognized that a separate trustee would serve to manage the loans in the mortgage

61

backed securities while a loan servicer would collect payments from the borrowers. *See Anderson*, 424 Md. at 237; *Deutsche Bank*, 430 Md. at 718.

After the Task Force's Report, the General Assembly enacted Maryland foreclosure law reform in the 2008, 2009, and 2010 legislative sessions to set forth specific procedures and requirements for all parties seeking an *in rem* foreclosure proceeding. It would have been contradictory for the General Assembly to have passed foreclosure reform legislation specifying how mortgage industry entities should purse foreclosure actions without mentioning the requirement for an MCALA license if the legislature believed that these same parties were included under the scope of MCALA.

Similarly, when the General Assembly enacted the Statutory Trust Act in 2010, the legislature specifically decided that the statutory trusts were not doing business in Maryland when foreclosing on deeds of trust, recognizing that the previous Maryland mortgage foreclosure law reform would dictate the requirements for the *in rem* proceeding. As such, the legislative history surrounding MCALA, the Maryland mortgage foreclosure law, and the Statutory Trust Act all confirm the mortgage industry did not fall under the scope of MCALA.

Therefore, this Court holds that the General Assembly did not intend for foreign statutory trusts to obtain a collection agency license under MCALA before its substitute trustees file a foreclosure action in circuit court. Pursuant to our legislative intent analysis, we conclude that foreign statutory trusts are outside of the scope of the collection agency industry regulated and licensed under MCALA. In each of the cases *sub judice*, the owner of the mortgage loan was a foreign statutory trust serving as a special purpose vehicle.

These foreign statutory trusts were not required to obtain a license under MCALA before the substitute trustees instituted foreclosure proceedings on their behalf. As such, the circuit courts in the cases *sub judice* erred in dismissing the foreclosure proceedings on the basis that the owners of the mortgage loans were foreign statutory trusts that were not licensed as a collection agency under MCALA.

**IN NO. 40, THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED, AND THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASES TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY RESPONDENTS.**

**IN NO. 45, THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IS REVERSED AND THE CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLEES.**

**IN NO. 47, THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS REVERSED AND THE CASE IS REMANDED TO THAT COURT FOR**

**FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLEES.**

Circuit Court for Montgomery County
Case No. 397954V

Circuit Court for Montgomery County
Case No. 396663V

Circuit Court for Howard County
Case No. 13-C-16-106882

Circuit Court for Washington County
Case No. 21-C-15-055314

Argued: November 30, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 40, 45, & 47

September Term, 2017

_____

KYLE BLACKSTONE, ET AL.

v.

DINESH SHARMA, ET AL.

_____

TERRANCE SHANAHAN, ET AL.

v.

SEYED MARVASTIAN, ET AL.

_____

LAURA O'SULLIVAN, ET AL.
SUBSTITUTE TRUSTEES

v.

JEFFREY ALTENBURG, ET AL.

_____

MARTIN S. GOLDBERG, ET AL.
SUBSTITUTE TRUSTEES

v.

MARTHA LYNN NEVIASER, ET AL.

_____

Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,
Harrell, Glenn T., Jr.,
    (Senior Judge,
      Specially Assigned)

JJ.

_____

Dissenting Opinion by McDonald, J.
which Adkins, J., joins.

_____

Filed: August 2, 2018

I agree with the conclusions reached by the Circuit Court judges who decided these four cases, now consolidated before us, and with the succinct and well-reasoned reported opinion of the Court of Special Appeals in the two cases that passed through that court. 233 Md. App. 58 (2017). Accordingly, I must dissent from the Majority Opinion.

*The Issue*

The issue in this case is relatively simple. In 2007, the General Assembly amended the Maryland Collection Agency Licensing Act,[1] known by the mellifluous acronym "MCALA," to extend the licensing requirement of that law to a "person" – a term that includes entities[2] – that collects consumer debt that the person owns as well as consumer debt owned by others. The obvious purpose, demonstrated both by the amendment's language and by its legislative history, was to require those who buy, and attempt to collect, defaulted consumer debt to obtain the requisite license. The main question before us is whether the amended statute applies to those who buy, and attempt to collect, defaulted consumer mortgage debt.

Petitioners are substitute trustees who have initiated foreclosure proceedings on behalf of foreign statutory trusts with respect to defaulted residential mortgage debt purchased by the trusts. The circuit courts and the Court of Special Appeals all concluded that MCALA covers that collection activity and that the trusts must be licensed under MCALA to undertake it.

---

[1] Maryland Code, Business Regulation Article ("BR"), §7-101 *et seq.*

[2] *See* BR §1-101(g).

Petitioners have advanced essentially three theories for reversing those decisions: (1) that the trusts do not act as a "collection agency" under MCALA; (2) that the act of foreclosing on a residential mortgage is not the collection of a debt under the statute; and (3) that, even if their activities do bring the trusts within MCALA, they need not obtain a license because the trusts qualify for a statutory exemption in MCALA for financial institutions known as "trust companies."[3]

### *Application of MCALA in these cases*

The starting point, of course, is the text of the statute. Pertinent to these cases, the licensing requirement of MCALA applies to an entity that "engages directly or indirectly in the business of … collecting a consumer claim the [entity] owns if the claim was in default when the [entity] acquired it…." BR §7-101(d)(1)(ii) (definition of "collection agency"). A "consumer claim" is defined to be a claim that is "for money owed" and that "arises from a transaction in which, for a family, household, or personal purpose, the [debtor] sought or got … real property…." BR §7-101(f).

Application of the statute in these cases is straightforward. The debt at issue in each case is a loan for the purchase of a residential property secured by a deed of trust – colloquially, a mortgage. Thus, the debt represents money owed in connection with a transaction for "a family, household, or personal purpose" involving real property. There is no question that these debts fit the definition of "consumer claim." In each case, a statutory trust acquired the consumer claim at a discount, as the debt was already in default.

---

[3] BR §7-102(b)(8).

2

These trusts were created specifically for the purpose of acquiring these claims (together with numerous other similar consumer claims) for the purpose of collecting those debts for the benefit of the trust and, of course, the owners of the trust. Accordingly, each of these trusts, acting through the Petitioner trustees, is an entity in the business of collecting consumer claims that it owns and that it acquired when the claim was already in default. Thus, in each case, the trust must be licensed pursuant to MCALA.

### *The Majority Opinion*

The Majority labors over 64 pages to justify its conclusion that the statute does not mean what it says. Before detailing the problems with that analysis, it is worth noting that the Majority Opinion explicitly declines to endorse Petitioners' argument that a foreclosure action is not collection of a debt under MCALA.[4] *See* Majority slip op. at 3-4 n.3. Nor does the Majority Opinion adopt Petitioners' argument that these entities are "trust companies" – correctly in my view.[5] (If these entities were trust companies, there would

---

[4] Petitioners' argument on this score is without merit. They ask us to view the act of foreclosure with a set of blinders and to focus on the process of foreclosure while ignoring the fact that the deed of trust exists to secure a consumer debt and the foreclosure proceeding is an effort to collect at least part of that debt by dispossessing the debtor of the property and selling it.

[5] In touting the statutory trusts as "trust companies," Petitioners cobble together dictionary definitions and out-of-state statutes to develop an argument that would sweep just about anything called a "trust" into the category of "trust company." If Petitioners' approach had any merit, a family that finances its children's education would qualify as a savings and loan association: the parents save, the kids get loans, and they are all associated – presto, a "savings and loan association." Petitioners' creative argument ignores more relevant statutory provisions – *e.g.,* Maryland Code, Financial Institutions Article, §1-101(d), 3-101(g); Commercial Law Article, §4-105(1), 4A-105(a)(2) – as well as the fact that the "trust company" exclusion in the original codification of MCALA was grouped with other financial institutions. Petitioners have not identified any subsequent amendment

3

be no need for the Majority Opinion to comb through the legislative history to justify an exemption for them – the text of the statute clearly exempts trust companies. BR §7-102(b)(8)).

To the extent that the Majority Opinion agrees with the Petitioners, it deviates from our usual approach to statutory construction and, in the course of that journey, creates its own criteria for application of MCALA that do not appear in the statute itself. The problems with this approach and with the conclusions that the Majority Opinion draws are several:

● *In the beginning is the text*.

Every appellate decision that sets forth the process for the interpretation of statutes – decisions too numerous to be counted – says that we start with the text. The Majority Opinion acknowledges this bedrock principle,[6] but essentially skips that step and focuses on the legislative history to find some justification for ignoring the clear import of the plain text of the statute. Indeed, a reader of the Majority Opinion does not encounter the current text of the key statutory provisions until pages 25-27, nearly halfway into the opinion. The Majority Opinion notes that the statute defines "collection agency." But it then quickly casts aside the statutory definition in favor of what it describes as the "commonly understood" definition, declares a "conflict" between the two, and then spends most of its analysis on legislative history materials. This approach to statutory construction has been

---

of MCALA intended to expand that exclusion substantively along the lines that Petitioners imagine.

[6] Majority slip op. at 23.

4

likened by a federal appellate judge to "entering a crowded cocktail party and looking over the heads of the guests for one's friends." Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432 (1995).

To escape the plain meaning of the text and find its way to the more malleable legislative history, the Majority Opinion must declare the text to be ambiguous. And so it does. Majority slip op. at 31, 49, 60.

- *The Majority Opinion finds ambiguity where there is none.*

The vast majority of the judges who have been called upon to apply MCALA have found that its language is not ambiguous. *See Bradshaw v. Hilco Receivables, LLC*, 765 F.Supp.2d 719, 726-27 (D.Md. 2011) ("MCALA is clear on its face"); *Ademiluyi v. PennyMac Mortgage Investment Trust Holdings I, LLC*, 929 F.Supp.2d 502, 520-24 (D.Md. 2013) ("The plain language of MCALA is not ambiguous"); *Blackstone*, 233 Md. App. at 70 ("insofar as the issue here presented [*i.e.,* application to a purchaser of defaulted mortgage debt], MCALA is unambiguous"); *Altenburg v. Caliber Home Loans, Inc.*, 2017 WL 2733803 at *6 (same); *Old Republic Insurance Co. v. Gordon,* 228 Md. 1, 22 (2016) (Nazarian, J., dissenting) (rejecting the argument "that there is any ambiguity in [the MCALA definition of "collection agency"]); *but see Old Republic*, 228 Md. App. at 17-18.[7] The Majority Opinion discounts those decisions on the basis that in matters of

---

[7] *Old Republic* concerned whether a credit insurer that was subrogated to a defaulted debt under one of its insurance policies was covered by MCALA. Two of the judges on the panel concluded that it was not "in the business" of acquiring defaulted debt; one judge concluded that it was. The case was not reviewed in this Court, as neither party sought a

5

Maryland law, we rule. *See* Majority slip op. at 31 n.17. That may be true, but the Majority Opinion's use of legislative history to reach a contrary result is shaky, even if one is willing to ignore the statutory text.

● *The Majority Opinion substitutes its own criteria for the statutory criteria.*

Instead of focusing on the terms used in the statute, the Majority Opinion instead explores the legislative history materials to determine whether these trusts are "actors" in the appropriate "industry." The Majority Opinion posits that the General Assembly exempted the "mortgage industry" from MCALA (ignoring the statutory language that exempts specific entities or individuals, but not "industries"), identifies Petitioners as "actors" in the "mortgage industry" (again, terms not found in the statute), and concludes that Petitioners are not subject to MCALA. Majority slip op. at 32-48. The terms "collection agency industry," "mortgage industry," or "actors" in those industries do not appear in the statute. It is not necessary to wrestle with those concepts when the actual statutory language can be applied in a straightforward manner.

In tagging these statutory trusts as "actors" in the "mortgage industry," the Majority Opinion describes in some detail the use of securitized mortgage pools. Majority slip op. at 51-53. Of course, securitized mortgage pools were a key driver of the financial downturn known as the Great Recession, although there is nothing inherently bad, and probably much that is economically beneficial, in the securitization of mortgage pools when it is done

---

writ of *certiorari*. Unlike that case, in which the insurer simply accepted a risk that it might end up with a right to a defaulted debt, in these cases, the trusts deliberately purchased mortgage debt that was already in default at a discount.

6

ethically with appropriate standardization and regulation.[8]  But the Majority Opinion never quite explains how it has determined that these particular statutory trusts are part of what it characterizes as the exempt "mortgage industry."  There is no indication in the record that these trusts make loans for residential properties or originate mortgages.  Nor is there any indication that they provide liquidity to the mortgage market by purchasing a mortgage from an originator shortly after the mortgage is issued.

What these trusts do, apparently, is buy mortgage debt at a price below face value after the mortgage is in default and attempt to collect that debt through foreclosure of the deed of trust or otherwise.  These entities are not supporting the mortgage market by spreading the risk of default.  The mortgages that are pooled and securitized in these entities were *already* in default.  This is simply the incursion of the debt buying and collection industry into another sphere of economic activity involving yet another form of bad debt – defaulted mortgage debt – a recent phenomenon documented in legal literature and the financial press.  *See* Judith Fox, *The Foreclosure Echo:  How Abandoned Foreclosures are Re-entering the Market Through Debt Buyers*, 26 Loyola Consumer L. Rev. 25, 68-70 (2013) ("As debt collectors, who traditionally shied away from mortgage deficiency collection, enter the market, they are likely to bring the problems associated with the

---

[8] The needless complexity, unethical behavior, and sheer greed that powered the explosion of securitized mortgage pools in the late 1990s and early 2000s and that helped trigger the Great Recession have been chronicled in works sacred and profane.  *See, e.g.*, Gretchen Morgenson & Joshua Rosner, Reckless Endangerment (2011) at 48-49, 142-53; Adam McKay (director), "The Big Short" (Paramount Pictures 2015) (based on nonfiction book by the same name by Michael Lewis (2010)); Pope Francis, *Considerations for ethical discernment regarding some aspects of the present economic-financial system* (May 17, 2018) at ¶¶25, 26.

collection of credit cards into the world of mortgage deficiencies."); s*ee also* Matthew

Goldstein, *As Banks Retreat, Private Equity Rushes to Buy Troubled Home Mortgages*,

New York Times (September 28, 2015); Carolyn Said, *Vulture Investors buy up distressed*

*mortgages*, San Francisco Chronicle (June 7, 2010); Jim Wasserman, *Debt collectors can*

*come calling years after a mortgage default,* Washington Post (March 27, 2010).

- *The Majority Opinion confuses registration of a type of business organization with regulation of a type of business.*

The Majority Opinion conjures a false dichotomy when it argues that foreign

statutory trusts, like the entities involved in these cases, are regulated separately from

collection agencies. Majority slip op. at 56-59. This argument confuses registration

requirements related to the *form of business organization* of an entity with regulation of

the *type of business* that the entity engages in.

The Foreign Statutory Trust Act requires foreign statutory trusts that "do business"

in Maryland to register with the State Department of Assessments and Taxation ("SDAT").

Maryland Code, Corporations & Associations Article ("CA"), §12-902. If a foreign

statutory trust fails to register, the consequence is that the trust cannot bring suit in a

Maryland court. CA §12-903. The statute excludes certain activities from the concept of

"doing business," with the result that a foreign statutory trust may engage in those activities

in Maryland without having to register with SDAT in order to bring suit in a Maryland

court. CA §12-908. The Majority Opinion notes that one of activities on the list of

exclusions is "foreclosing mortgages and deeds of trust"[9] and concludes that "there is a

---

[9] CA §12-908(a)(5).

8

direct conflict [with the argument] that MCALA requires foreign statutory trusts to obtain a license as a collection agency before engaging in foreclosure proceedings." Majority slip op. at 57. Based in part on that alleged conflict, it concludes that the licensing requirement in MCALA must not apply to a foreign statutory trust.

But that analysis does not pay heed to the statutory text – this time, the text of the Foreign Statutory Trust Act. The exceptions to the concept of "doing business" in the Foreign Statutory Trust Act are "for the purposes of this subtitle"[10] – *i.e.*, the Foreign Statutory Trust Act – not for purposes of MCALA or any other statute. There is no "conflict." All the exception in the Foreign Statutory Trust Act means is that a foreign statutory trust may initiate a foreclosure action in a Maryland court without first registering with SDAT. It does nothing to exempt the trust from other applicable Maryland laws. There are seven other listed exceptions from the concept of "doing business" that also have the effect of exempting a foreign statute trust from the SDAT registration requirement. *See* CA §12-908(a). But those exceptions do not set the foreign statutory trust free from other Maryland laws. For example, under CA §12-908(a)(7), a foreign statutory trust may rent and operate property as a result of a foreclosure proceeding without registering with SDAT. But that does not exempt the trust from landlord-tenant laws in Maryland.

More broadly, a statutory trust is simply a form of business organization, in the same way that a corporation or a limited liability company is a form of business organization.

---

[10] CA §12-908(a).

9

Depending on an entity's form of business organization, the entity must comply with different organizational and registration requirements set forth in the Corporations & Associations Article of the Maryland Code.[11] But the form of business organization does not necessarily tell one anything about what kind of business the entity conducts.

The type of business that an entity engages in may subject it to regulation by the State, local, or federal governments. That substantive regulation of the entity's business does not necessarily depend on its form of organization. An entity may be appropriately organized and registered under the Corporations and Associations Article, but may still be required to obtain a license and comply with statutes that regulate the type of business that it conducts. A collection agency organized as a corporation that complies with whatever filing and registration requirements would apply to that form of business organization does not thereby become exempt from MCALA. Neither does a statutory trust.

● *The Majority Opinion limits the scope of MCALA contrary to legislative intent.*

The Majority Opinion refers repeatedly to the small number of collection agencies (110) covered by MCALA when it was first enacted in 1977 and the reported number of entities (40) that exploited a loophole in that statute in the mid-2000s. *See* Majority slip op. at 34, 37, 41, 43, 44, 55. It infers that the statute was intended to be very limited in its scope. Of course, the numbers cited by the Majority Opinion relate to a period before the

---

[11] *See, e.g.,* Maryland Code, Corporations & Associations Article ("CA"), §2-101 *et seq.* (corporations); CA §3-101 *et seq.* (close corporations); CA §4A-101 *et seq.* (limited liability companies); CA §8-101 *et seq.* (real estate investment trusts); CA §9A-101 *et seq.* (partnerships); CA §10-101 *et seq.* (limited partnerships); CA §12-101 *et seq.* (statutory trusts).

10

proliferation of statutory trusts that buy defaulted mortgages and attempt to collect them. This is not a situation where there are a limited number of collection agency licenses to be awarded, like taxi medallions. Rather, the number of individuals or entities subject to a particular type of regulation grows with the growth of the activity that is regulated.[12] The number of lawyers has grown exponentially since the profession was first regulated in this State. The same is likely true of most other regulated businesses.

There is no question that the public officials responsible for enforcing MCALA at that time of the 2007 amendment of the statute believed that the original definition of "collection agency" in the statute was too narrow in not encompassing debt buyers and that they pointed to specific entities that were exploiting that loophole at that time. But that does not mean that the reach of the amended statute was limited to those few examples. As the Majority Opinion recounts, one of the agency board members who testified before the Legislature sought the amendment because debt purchasers "are increasing in number" partly as a result of "unregulated newly-evolved kinds of businesses not covered under current licensing laws" that were engaged in the purchase and collection of defaulted debt.[13] *See* Majority slip op. at 46-47 (quoting testimony Eileen Brandenburg, member of

---

[12] As the legislative history of MCALA demonstrates, the number of collection agencies covered by the statute had increased 13-fold in the period from 1977 (110) when it was originally enacted to 2007 (1304), when it was amended. *See* Floor Report for House Bill 1324 (March 28, 2007) at 2.

[13] In its effort to find a legislative intent to exclude the purchase of defaulted mortgage debt from the purview of MCALA despite the statute's clear language, the Majority Opinion makes some curious leaps of logic. For example, it notes the absence of opposition to the 2007 amendments by the bankers associations, title insurers, and mortgage servicers. Majority slip op. at 46-47. It infers from that silence that the 2007

11

State Collection Agency Licensing Board before House Economic Matters Committee). The statutory trusts in these cases are "a newly evolved kind of business" that would not have been covered under the original version of MCALA. But they come clearly within the plain language that the General Assembly enacted to respond to that concern.

*Summary*

The Majority Opinion concludes that foreign statutory trusts are not required to be licensed under MCALA. However, it explicitly does not decide whether foreclosure of defaulted mortgage debt by someone other than a foreign statutory trust is "debt collection" under the statute and whether trustees or substitute trustees, who are the agents of these trusts, must be licensed under MCALA. Majority slip op. at 3-4 n.3. It may well be that the bottom line of the Majority Opinion is that the homeowners in these cases simply identified the wrong party in their motions and counter-complaints.

In my view, however, the language of MCALA is clear. The legislative history of the statute does not contradict that language. The statutory trusts in these cases are in the business of buying and attempting to collect defaulted consumer debt that was already in

---

amendment of the statutory definition of "collection agency" does not encompass the trusts in this case.

The Majority Opinion thus looks for legislative intent by first looking at what *potential opponents* of the bill that was adopted *did not say*, speculating on why they did not say it, and then attributing that speculation to the intent of the legislators who passed the bill. Apart from the fact that this seems to take the path of a Rube Goldberg contraption to discerning legislative intent, the premise is dubious. The silence of those lobbyists could well be explained by the fact that the amendment did nothing to alter the existing exclusion of banks, title companies and various financial institutions from MCALA. *See* BR §7-102(b).

default when they acquired it. They must obtain a collection agency license. The decisions of the circuit courts and the Court of Special Appeals should be affirmed.

Judge Adkins has advised that she joins this opinion.